Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUAN CHEN, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>        v.<br><br>LYFT, INC., DAVID RISHER, and ERIN BREWER,<br><br>                Defendants. | Case No.: 3:24-cv-1330<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff, Yuan Chen, by and through his attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation, review and analysis of: (a) public filings made by Lyft, Inc. ("Lyft" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) press releases, shareholder communications, Lyft's postings on Lyft's investor relations website, and other public statements disseminated by Defendants (as defined below); (c) news articles and analyst reports concerning Lyft; (d) other publicly available information concerning Lyft and the Individual Defendants (as defined below).

### **NATURE OF THE ACTION**

1.      This is a federal securities class action alleging claims against Lyft and certain of its officers (collectively "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of a "Class" of all persons who purchased or otherwise acquired Lyft common shares on a U.S. open market during the class period February 13, 2024 at 4:05 p.m. through February 13, 2024 at 4:51 p.m. (the "Class Period"). Excluded from the Class are Defendants in this action, the officers and directors of the Company as of February 13, 2024 (the "Excluded D&Os"), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

2.      Lyft publicly issued a press release reporting fourth quarter 2023 operating results on February 13, 2024 at 4:05 p.m.  The press release was also filed with the SEC as an exhibit to a Form 8-K.  The press release misrepresented that Lyft anticipated an "[a]djusted EBITDA margin expansion … of approximately 500 basis points year-over-year."  In fact, Lyft only anticipated a 50 basis point margin expansion.  Thus, rather than anticipating 2024 margins of 6.6%, in fact Lyft was only anticipating 2024 margins of 2.1%.  Contemporaneous with the issuance of the press release, Lyft issued Supplemental Data supporting the press release that similarly misrepresented the 500 basis point margin expansion.

3.      The misrepresentation with respect to margins was material and caused Lyft common stock, which closed on February 13, 2024 at $12.13, to trade as high as $20.25 in the aftermarket (between 4:40 p.m. and 4:41 p.m.).

4.      To company insiders who were responsible for ensuring the accuracy of the press release and Supplemental Data, the misrepresentation was so apparent that it went beyond mere negligence, and amounted to a reckless indifference to the truth.

5.      Moreover, Defendants delayed in correcting the press release and Supplemental Data.  Thirty-five separate research analysts issued research reports on Lyft common shares on February 13, 2024 and it is not plausible that no analyst inquired of Defendants or Lyft's other senior officers as to the accuracy of the 500 basis point margin expansion within minutes of the issuance of the press release.  Yet, the press release and Supplemental Data went uncorrected until approximately 4:47 p.m. when Defendant Erin Brewer (Lyft's CFO) first stated on an investor conference call (17 minutes into the call), that Lyft anticipated a margin expansion of 50 basis points.

6.      Brewer's statement had an immediate impact on the market, with Lyft common shares reversing and trading at $12.92 a share between 4:50 and 4:51 p.m.  Between 4:05 p.m. and 4:51 p.m., however, millions of Lyft shares traded at inflated prices.

7.      It was not until 24 minutes into the call, in response to a question, that Brewer acknowledged that her reference to 50 basis points was "actually a correction from the press release."

8.      Subsequently, in interviews on February 14, 2024, Defendant David Risher (Lyft's CEO) distorted the facts and misrepresented that the misstatement was only in one document (the press release), whereas the misstatement was made twice (in the press release and Supplemental Data), and that Lyft "issued an immediate correction….  We issued a correction in a second."  In fact, as alleged above, Defendant Brewer waited until the 24th minute of the conference call to correct the misstatement.

9.      That Defendants did not move promptly to correct the misstatement is corroborating evidence that the initial misstatement was either knowing or severely reckless.

10.     Defendants were motivated to misrepresent the true facts because Lyft had a large short position and research analysts who were short the stock had issued negative commentary on Lyft common stock. The presence of the large short position had a negative impact on the Individual Defendants' ability to earn stock-based performance bonuses.  Defendants knew that many if not most of the shares that traded in the aftermarket were shorts that were covering their positions and therefore were motivated not to move promptly to correct the press release.

**JURISDICTION AND VENUE**

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action is a civil action arising under the laws of the United States, and under Section 27 of the Exchange Act (15 U.S.C. § 78aa), which vests exclusive jurisdiction for violations of the Exchange Act in the District Courts of the United States.

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

15.     Plaintiff Yuan Chen purchased 20,000 shares of Lyft common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Lyft is incorporated in Delaware and has its principal executive offices in San Francisco, California.  Lyft common shares trade on the NASDAQ under the ticker symbol "LYFT."

17.     Defendant David Risher is the Chief Executive Officer ("CEO") of Lyft, effective April 2023 through to the present, and is a Director on Lyft's Board of Directors, effective July 2021 through to the present.

18.     Defendant Erin Brewer is the Chief Financial Officer ("CFO") of Lyft, effective July 2023 through to the present.

19.     Defendants Risher and Brewer (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

20.     The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

21.     Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had been misrepresented, and the true facts were being concealed from the public and that the positive representations that were being made were then materially false or misleading. The Individual Defendants are liable for the false statements pleaded herein.

22.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

## **FACTUAL ALLEGATIONS**

**I.     Background – Lyft's Short Position**

23.     Lyft has outstanding one of the largest short positions of a U.S. publicly traded corporation on Wall Street.

24.     According to *The Wall Street Journal*, in a February 14, 2024 news article:

The stock has been more targeted by short sellers than its gig-economy counterparts, with short interest accounting for nearly 12% of Lyft's shares outstanding compared with less than 3% for rival Uber, according to data from FactSet.

25.     A short position occurs when an investor borrows shares from the owner of common stock and sells those shares into the market.

26.     In effect, those shares become owned by two different investors – the first investor who loaned the shares and the second investor who purchased those shares from the investor who borrowed the stock.

27.     The investor who borrowed the stock and sold those shares to a third party is said to be "short" the stock in that they "owe" -- or have a contractual obligation to return – those shares to the initial investor.

28.     Short sellers generally invest against a stock's performance in anticipation that the stock will decline in value so that the short seller can buy and return the lent shares at prices lower than the short seller had sold the shares initially.

29.     Whereas investors who are "long" a stock rely on the integrity of the market, but believe that the shares will appreciate in value, investors who are "short" a stock also rely on the integrity of the market but believe the shares will decline in value.

30.     Short sales are generally considered to depress the market price of a stock because it adds to the available number of shares that trade.

31.     Short sellers also at times issue research reports asserting that shares of Lyft common stock are over-valued by the market.

32.     Short sales are generally borrowed on margin and are marked to market weekly. That means that if the underlying shares increase in value over a week, the short seller is required to increase the margin that covers their short position.

33.     When there is insufficient margin to cover the short sale, a brokerage firm can force the short seller to purchase shares at the market price to cover the short position.

34.     This protects brokerage firms to ensure that there is adequate equity in the short seller's account to cover the short position.

35.     In addition to borrowing and selling shares, an investor can be short the stock by selling calls.

36.     By selling a call, an investor is obligated to deliver shares of the underlying stock at the exercise price.

37.     If the price of a stock exceeds the strike price of the call, the investor that sold the call is obligated to purchase the shares at the higher market price and deliver the shares at the lower strike price.

38.     Calls work similarly to common shares and are marked to market weekly.

39.     In addition to having a very large short position in common shares, Lyft call option contracts are actively traded.

40.     Each of Risher and Brewer is entitled to substantial performance based executive compensation based on Lyft common stock achieving certain price-based benchmarks.

41.     The presence of a large short position in Lyft common stock is an impediment to Risher's and Brewer's ability to achieve those performance based benchmarks.

## II.     Lyft's Fourth Quarter 2023 Press Release

42.     Lyft released its year-end and fourth quarter 2023 operating results in a press release after the close of the market on February 13, 2024.  The press release was also filed with the SEC as an exhibit to a Form 8-K.

43.     Lyft's operating results were anxiously awaited by investors, especially given the large short position.

44.     According to the transcript of the subsequent February 13, 2024 conference call, nine stock analysts were identified as participating on the call.

45.     The Lyft press release and accompanying Supplemental Data were issued by Lyft at 4:05 p.m.

46.     The Lyft press release and Supplemental Data (at page 10) misrepresented in a bulleted line item that Lyft anticipated "Adjusted EBITDA [Earnings Before Interest Taxes Depreciation and Amortization] margin expansion (calculated as a percentage of Gross Bookings) of approximately 500 basis points year-over-year."

47.     A basis point is one-one hundredth of a percent.

48.     Inasmuch as Lyft had reported 2023 EBITDA margins of approximately 1.6%, a 500 basis point (or 5.0%) margin expansion would have increased profitability to 6.6% -- or by over three times historical results.

49.     News services and stock analysts reported promptly on the four-fold anticipated increase in profitability from 1.6% to 6.6%.

50.     Thus, The Fly, an investor news service, reported at 4:08 p.m. that Lyft "[s]ees FY24 adjusted EBITDA margin expansion roughly 500 basis points."

51.     Streetinsider.com, another investor publication, also reported at 4:09 p.m. that Lyft anticipated "[a]djusted EBITDA margin expansion ... of approximately 500 basis points year-over-year."

52.     However, to company insiders who were familiar with Lyft's historical and anticipated operating results, the misstatement in the press release and Supplemental Data would have stuck out "like a sore thumb."

53.     As would be expected the misstatement set off a furious aftermarket rally in Lyft common stock, with the common stock price increasing minute by minute, with high volume.

54.     Lyft common shares had closed on February 13, 2024 at 4:00 p.m. at $12.13 per share.

55.     The press release with the misstated margins caused Lyft shares to increase to $15.59 a share in the aftermarket by 4:17 p.m. and to $16.61 a share in the aftermarket by 4:27 p.m. Lyft shares traded as high as $20.25 in the aftermarket (at approximately 4:41 p.m.).

56.     Unlike common shares, stock options do not trade in the aftermarket.

57.     Accordingly, investors who were short options were forced to cover the financial exposure of those options in the aftermarket by purchasing common shares.

58.     Throughout the period immediately after the release of fourth quarter earnings, given the rapid increase in Lyft's stock price and the media's reporting of the profit margins, company management, including David Risher (the CEO) and Erin Brewer (the CFO) either had actual knowledge of the misstatement or were recklessly indifferent to the truth of the misleading press release and Supplemental Data.

CLASS ACTION COMPLAINT                                                                    7

59.     Subsequent comments made by investors and stock analysts indicated that the 500 basis point margin expansion was anomalous because it was far in excess of Lyft's historical performance.

60.     Bloomberg lists 35 separate stock analysts who provide active coverage of Lyft common stock.

61.     It is highly likely, if not certain, that one or more of those analysts – or other investors -- contacted the Defendants or other Lyft personnel in the minutes immediately after the issue of the press release to obtain clarification on the 500 basis point margin expansion.

62.     Thus, Defendants knew or were almost certain to know of the misstatement on or shortly after 4:05 p.m. on February 13, 2024.

**III.     The 4:30 P.M. Conference Call**

63.     Defendants' deliberate recklessness or knowledge of the misstatement is further evidenced by the investor conference call, which was scheduled for 4:30 p.m.

64.     Defendants failed to promptly or transparently correct the misleading fourth quarter press release.

65.     The casual and belated manner in which the Individual Defendants disclosed the enormous ten-fold misstatement of anticipated margin expansion supports a strong inference that the Individual Defendants were aware of the problem prior to the call and determined to downplay its significance.

66.     It was not until approximately 17 minutes and 20 seconds into the call that Brewer first spoke about anticipated 2024 gross margins.

67.     Brewer did not however at that time explicitly correct the misstatement in the press release.  Rather, she only stated on the call that:

The combination of top-line growth, operational excellence, and continued cost discipline with the full-year impact of our more efficient cost structure is expected to drive approximately 50 basis points of expansion in our adjusted EBITDA margin as a percentage of gross bookings to 2.1%.

68.     However, Brewer's reference to the 50 basis point expansion had a direct impact on the market, with Lyft shares declining from $19.52 a share at 4:45 p.m. to $12.92 shortly after 4:50 p.m.

69.     According to Bloomberg data, reported volume, which averaged well in excess of 500,000 shares per minute in the aftermarket after release of earnings, spiked to 2.86 million shares traded in the one minute from 4:50 p.m. to 4:51 p.m.

70.     At approximately 24 minutes and 20 seconds into the call, Brewer, in response to the second question on the Q and A, unapologetically corrected the 500 basis point error in the press release and Supplemental Data:

**Nikhil Devnani, Analyst**…. Could we just please clarify the EBITDA margin expansion? I think the slides say 500 basis points, but, Erin, you mentioned 50 basis points, so I think it is 50 basis points….

**Erin Brewer, Chief Financial Officer**….  This is Erin, and this is actually a correction from the press release. You're correct. In my prepared remarks, I referenced 50 basis points of margin expansion. So if you look at our full-year performance for 2023 at 1.6%, you can translate that into approximately 2.1% in terms of our directional commentary in 2024….

71.     Lyft however did not issue a corrected press release or Supplemental Data until February 13, 2024 at 6:02 p.m.

72.     The February 14, 2024 *The Wall Street Journal* article, suggested that the large trading volume after market on February 13, 2024 was attributable to short covering:  "Positive earnings reports typically drive short sellers to buy shares to cover their bets."

**IV.    Defendant Risher's Mea Culpa**

73.    In a February 14, 2024 CNBC interview defendant Risher acknowledged "it was a bad error, and that's on me."

74.    However, Risher misrepresented the speed at which Lyft corrected the misstatement:

> Thank goodness we caught it pretty fast and we issued an immediate correction….
>
> We issued a correction in a second.

75.    Risher also misrepresented that "the only place the problem was was one place." In fact, the "problem" was in both the press release and the Supplemental Data.

76.    That the misstatement was in two places creates a strong inference that the "problem" was either intentional or resulting from deliberate recklessness, or that the personnel responsible for drafting and reviewing the financial disclosures did not understand what a basis point meant, which is not credible.

77.    Risher also participated in a Bloomberg News interview on February 14, 2024, in which he acknowledged that "it's on me …. [A]t the end of the day … my bad….  It's an unacceptable error again ultimately it's on me.  I'm the CEO.  Buck stops with me."

78.    Risher on the Bloomberg interview again misrepresented the speed at which Lyft corrected the misstatement in the press release: "Like with any mistake, I think it's not so much about the mistake itself. It's also about how you correct for it.  And we've corrected for it, obviously in the moment."

79.    Investors on Seeking Alpha were not impressed by Risher's purported contrition. One investor wrote:  "Hohoho.  I doubt he means it given the short squeeze."  A second investor wrote sarcastically:  "I'm sure this has nothing to do with short positions being manipulated."  A third commentator wrote "Some angry shorts in the room."

80.    Notwithstanding his acceptance of blame, Risher has to date not offered to compensate investors who traded during the Class Period.

**V.     The Individual Defendants Were Financially Motivated to Perpetuate the Misstatement**

81.     Each of Risher and Brewer was financially motivated to perpetrate the misstatement, and has the financial resources to compensate Plaintiff and other members of the Class for their damages  – especially Risher, who has taken personal responsibility for the misleading press release.

82.     Risher was first appointed a Director of Lyft in July 2021.

83.     According to Lyft's 2022 Proxy Statement, Risher was a former Senior Vice President, U.S. Retail, at Amazon.com and a General Manager at Microsoft Corporation.

84.     Risher was paid cash compensation of $21,522 and stock compensation valued at $238,318 for his 2021 services as a Lyft director, and was paid cash compensation of $22,500 and stock compensation valued at $271,247 for his 2022 services as a Lyft director.

85.     Risher commenced services as Lyft's CEO on April 17, 2023.  According to Lyft's 2023 Proxy Statement, upon becoming CEO, Risher was paid a "signing bonus" of $3,250,000.

86.     Risher was also contractually entitled to be paid an annual base salary of $725,000 for 2023 and an annual target bonus opportunity of 100% of his base salary based on achievement of performance goals.

87.     Risher's annual cash bonus for 2023 was set at $1,000,000.

88.     Risher was also entitled to significant stock-based incentive compensation based on achieving stock price performance benchmarks.

89.     To make good on his admission of personal responsibility, Risher should compensate Plaintiff and the Class for their losses directly attributable to the misleading press release.

90.     Brewer was appointed Lyft's CFO effective July 10, 2023.

91.     According to the Form 8-K filed by Lyft dated May 16, 2023, Brewer was entitled to a signing bonus of $650,000 and is entitled to annual compensation of $650,000.

92.     In addition, Brewer was granted restricted stock units ("RSUs") to be valued at $10,800,000 as of their grant date, to vest over a four year period.

93. Brewer is also entitled to performance based RSUs.

94. According to documents filed with the SEC, Brewer owned 1,858,960 shares of Lyft common stock as of February 20, 2024.

95. Brewer should contribute to the fund to compensate Plaintiff and members of the Class.

**CLASS ACTION ALLEGATIONS**

96. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired Lyft common shares on a U.S. open market during the class period February 13, 2024 from 4:05 p.m. to 4:51 p.m. both times inclusive (the "Class"). Excluded from the Class are Defendants in this action, the officers and directors of the Company during the Class Period (the Excluded D&Os), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

97. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.

98. During the Class Period, Lyft common shares actively traded on the Electronic Communication Network (ECN). ECN refers to one or more electronic communications networks to which an order may be submitted for display and execution by a broker. ECNs electronically match buyers and sellers to execute limit orders. Extended-hours session orders may also be executed by a dealer at a price that is at or better than the ECN's best bid or offer. Millions of Lyft common shares were traded publicly during the Class Period.

99. ECN trading operates with a high level of efficiency, enabled by the automated matching of buy and sell orders. Unlike traditional trading systems, ECN executes transactions swiftly by directly connecting traders with liquidity providers. This eliminates the need for intermediaries, reducing delays in order execution.

100.    That Lyft stock moved so promptly and in such high volume upon dissemination of the fraud and the corrective disclosure demonstrates the efficiency of ECN with respect to Lyft.

101.    As of February 12, 2024, the Company had more than 391 million Class A shares outstanding. Record owners and other members of the Class may be identified from records maintained by Lyft or its transfer agent and may be notified of the pendency of this action by mail or email, using a form of notice similar to that customarily used in securities class actions.

102.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

103.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

104.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders by Defendants during the Class Period misrepresented or omitted material facts concerning Lyft's gross margin percentages;

d)    whether the market price of Lyft's common shares during the Class Period was artificially inflated and/or maintained due to the material misrepresentations or omissions and/or failures to correct the material misrepresentations or omissions complained of herein; and

e)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

105.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

106.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

107.    As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated by Defendants during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

108.    Among other things, the Individual Defendants, and other of Lyft's officers and directors who were responsible for creating and overseeing Lyft's internal controls over financial reporting, failed to install simple control procedures to ensure that the February 13, 2024 press release and Supplemental Data were accurate.  It was not only reasonably foreseeable, but *certain* that the misleading press release would have immediate and consequential ripple effects on the market.

109.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lyft, their control over Lyft's allegedly materially misleading statements and omissions, and their positions with the Company, which made them privy to confidential information concerning Lyft, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

110.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts

and conditions, including the fact that Lyft management had actually projected a 50 basis point (rather than a 500 basis point) expansion of margins. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

111.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, or shortly thereafter, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lyft who knew that the statement was false when made.

## LOSS CAUSATION

112.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

113.    During the Class Period, as detailed herein, Defendants made untrue statements of material fact or failed to disclose information necessary to make the statements made by Defendants not misleading. This artificially inflated the prices of Lyft common stock and operated as a fraud or deceit on the Class.

114.    When Defendants' prior material false statements and material omissions, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Lyft common shares fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

115.    The market for Lyft's common shares was open, well-developed, and efficient at all relevant times.

116.    As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Lyft common shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common shares relying upon the integrity of the market price of Lyft's common shares and market information relating to Lyft and have been damaged thereby.

117.    At all times relevant, the market for Lyft's common shares was an efficient market for the following reasons, among others:

a)      Lyft shares were listed and actively traded on the ECN, a highly efficient and automated market;

b)      As a regulated issuer, Lyft filed periodic public reports with the SEC and/or the NASDAQ;

c)      Lyft regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)      Lyft was followed by securities analysts employed by brokerage firms, including Bernstein, Goldman Sachs, Jeffries, and JP Morgan, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

118.    As a result of the foregoing, the market for Lyft common shares promptly digested current information regarding Lyft from all publicly available sources and reflected such information in the prices of the common shares.  Under these circumstances, all purchasers of Lyft common shares during the Class Period suffered similar injury through purchasing Lyft common shares at artificially inflated prices.

119.    Therefore, Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

120.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' omissions of material facts necessary to make the statements made by Defendants not misleading, including but not limited to the fact that Defendants failed to correct the press release and Lyft's internal controls over financial reporting were ineffective and did not stop the misstatement in the press release.

121.     Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects - information that Defendants were obligated to disclose during the Class Period but did not - positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

122.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

123.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

124.     Based upon the facts alleged herein, during the Class Period, Defendants violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchase of Lyft's common shares by the Plaintiff and the Class, (a) used or employed manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC; (b) employed devices, schemes, and artifices to defraud; (c) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and/or (d) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the Plaintiff and the Class.

125.    Defendants engaged in a plan, scheme, and course of conduct, that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate the market price of Lyft common shares; and (iii) cause Plaintiff and other members of the Class to purchase Lyft commons shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

126.    There is a general duty to correct under the federal securities laws.

127.    Defendants either knew that the press release and Supplemental Data was materially misleading or were deliberately reckless as to the truth of the corporate disclosures, and failed to correct the disclosures within a reasonable time (or suspend trading).

128.    Pursuant to the above, plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the press release, and other statements and documents described above.  Such releases and statements contained untrue statements of material facts or failed to disclose material information necessary to make the statements made not misleading.

129.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lyft's business, operations, and prospects, as specified herein.

130.    Defendants, individually and in concert, directly and indirectly,  employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lyft's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lyft and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of

business that operated as a fraud and deceit upon the purchasers of the Company's common shares during the Class Period.

131.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lyft's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of Lyft's common shares.

132.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lyft's common shares was artificially inflated and/or maintained, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the Common shares trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Lyft's common shares during the Class Period at artificially inflated and/or maintained prices and were damaged thereby.

133.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the failure of Lyft's internal controls, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Lyft's common shares, or, if they had purchased such common shares during the Class Period, they would not have done so at the artificially inflated and/or maintained prices that they paid.

134.    By virtue of the foregoing, Lyft and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135.    Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

136.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common shares during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

137.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.    The Individual Defendants acted as controlling persons of Lyft within the meaning of Section 20(a) of the Exchange Act as alleged herein.

139.    By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

140.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

141.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

142.    As set forth above, Lyft and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons of Lyft, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

143.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common shares during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A.     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

C.     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' and experts' witness fees and other costs; and

D.     Awarding such other relief as this Court deems appropriate.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: March 5, 2024

Respectfully submitted,

**WOLF POPPER LLP**

By: /s/ *Philip M. Black*
Philip M. Black (SBN 308619)
pblack@wolfpopper.com
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600

***Counsel for Plaintiff Yuan Chen***