Nicole Lavallee (SBN 165755)
Jeffrey V. Rocha (SBN 304852)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        jrocha@bermantabacco.com

*Liaison Counsel for Plaintiff and the Putative Class*

Philip M. Black (SBN 308619)
Robert C. Finkel (*Admitted Pro Hac Vice*)
Zilong ("Terrence") Zhang (*Admitted Pro Hac Vice*)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com
        rfinkel@wolfpopper.com
        tzhang@wolfpopper.com

*Lead Counsel for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| YUAN CHEN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> LYFT, INC., DAVID RISHER, and ERIN BREWER, <br><br> Defendants. | No. 3:24-cv-01330-TLT <br><br> **CLASS ACTION** <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> Dept.:  9 – 19th Floor <br> Judge:  Hon. Trina L. Thompson <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Yuan Chen ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief is based on the investigation of his undersigned Counsel, which included, among other things, review and analysis of: (i) Lyft, Inc.'s ("Lyft" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Defendants' (defined below) other public statements, including press releases, investor conference calls and analyst conferences; (iii) efforts to interview witnesses with personal knowledge of the facts; and (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Lyft and the industry in which it operates.  Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action alleging claims against Lyft and certain of its officers (collectively "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of a "Class" of all persons who purchased or otherwise acquired Lyft common shares on a U.S. open market during the class period February 13, 2024 at 4:05 p.m. through February 13, 2024 at 4:51 p.m.,[1] inclusive (the "Class Period").  Excluded from the Class are Defendants in this action, the officers and directors of the Company as of February 13, 2024 (the "Excluded D&Os"), members of Defendants' and the Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

2.      Lyft publicly issued a Press Release reporting fourth quarter 2023 operating results on February 13, 2024 at 4:05 p.m. (the "Press Release").

3.      The Press Release was also filed with the SEC as an exhibit to a Form 8-K.

---

[1] All times referenced below are in Eastern Standard Time.

4.      The Press Release referenced that a conference call was scheduled for February 13, 2024 at 4:30 p.m. for management to present the operating results for the fourth quarter of 2023.

5.      The Press Release was materially false and misleading because it misstated that for fiscal year ("FY") 2024 Lyft anticipated an "Adjusted EBITDA margin expansion … of approximately 500 basis points year-over-year" (the "Misstatement").[2]

6.      Contemporaneous with the issuance of the Press Release, Lyft issued on its website "Supplemental Data" supporting the Press Release that also projected the 500 basis point Adjusted EBITDA margin expansion.

7.      Adjusted EBITDA margin (defined as Adjusted EBITDA divided by Gross Bookings) is a key metric reported by Lyft in its SEC filings and quarterly operating results.

8.      In fact, as later corrected, Lyft was only anticipating a 50 basis point (or 0.50%) FY 2024 margin expansion.

9.      Lyft, in the Press Release, reported Adjusted EBITDA margins for FY 2023 of 1.6%, and thus was internally projecting FY 2024 Adjusted EBITDA margins of 2.1% (a 50 basis point increase).

10.     The Misstatement of a 500 basis point expansion misrepresented a projected 2024 Adjusted EBITDA margin of 6.6%, which exceeded the actual anticipated margin of 2.1% by 450 basis points.

11.     The Press Release and Supplemental Data also provided an "outlook" for the first quarter ("Q1") of FY 2024 for Adjusted EBITDA margin of "approximately 1.4% to 1.5%." Assuming that all quarters are weighted equally, that implied an Adjusted EBITDA margin for the back three quarters of FY 2024 of 8.3% (rounded).[3]

---

[2] EBITDA stands for "Earnings Before Interest Taxes Depreciation and Amortization."  A basis point is one-one hundredth of a percent.  500 basis points is 5.0%.

[3] In terms of arithmetic, [1.45% + (8.3% * 3)]/4 = 6.6% (rounded).

12. Defendants in their public statements subsequent to the Class Period on February 14, 2024, acknowledged, as they had to, that the publication of a full-year projected 500 basis point expansion in Adjusted EBITDA margin was materially false and misleading.

13. The 500 basis point misrepresentations in the Press Release and Supplemental Data with respect to the Adjusted EBITDA margin expansion were material and caused Lyft common stock, which had closed on February 13, 2024 at $12.13, to trade as high as $20.25 in the aftermarket (between 4:40 p.m. and 4:41 p.m.) (a 67% increase in price).

14. To Company insiders who were responsible for ensuring the accuracy of the Press Release and Supplemental Data, the Misstatement was knowing, if not intentional or was at least so apparent that it went beyond mere negligence, and amounted to a reckless and deliberate indifference to the truth.

15. Thirty-one separate sell-side analysts followed Lyft common stock as of February 13, 2024.

16. In research reports issued prior to the February 13, 2024 Press Release those analysts had projected consensus FY 2024 Adjusted EBITDA margins of approximately 2.08% (equivalent to a 0.57% or 57 basis points margin expansion from consensus FY 2023 expectations of 1.51%).

17. Sell-side analysts commonly issue preliminary research reports within minutes of the publication of quarterly operating results and would have been hamstrung and confused by the unprecedented and anomalous reference to a year-over-year margin expansion of 500 basis points.

18. Also, dozens of buy-side analysts similarly covered Lyft common stock, and would have been hamstrung and confused by the Press Release and Supplemental Data.

19. Given the nature of the Misstatement, there is a strong inference—stronger than any competing inference—that those analysts and other persons in the investment community contacted Defendants within minutes of the 4:05 p.m. issuance of the Press Release and

Supplemental Data to obtain clarity of the projected 500 basis point Adjusted EBITDA margin expansion.[4]

20.     In fact, Defendant David Risher (Lyft's Chief Executive Officer ("CEO")) in a February 14, 2024 interview on CNBC acknowledged that, after the issuance of the Press Release, Lyft was deluged with requests for clarification of the reference to a 500 basis point Adjusted EBITDA margin expansion—"you got things coming in at you from a thousand different directions and someone on the team noticed pretty fast that we were getting a lot of interest in the margin and she looked at the number and you could just see her jaw drop."

21.     Defendants had a duty to correct the materially false and misleading Press Release promptly, and failed to do so.

22.     Despite Risher's acknowledgment that Lyft personnel noticed the Misstatement "pretty fast," the Press Release and Supplemental Data went uncorrected for 42 minutes -- until 17 minutes into the conference call (at approximately 4:47 p.m., assuming the call started at 4:30 p.m.) when Defendant Erin Brewer (Lyft's Chief Financial Officer ("CFO")) first stated on the investor conference call that Lyft anticipated a margin expansion of 50 basis points.

23.     And it was not until 24 minutes into the call, in response to a question, that Brewer acknowledged that her reference to 50 basis points was "actually a correction from the Press Release."

24.     Brewer's statement at 4:47 p.m. had an immediate impact on the market, with Lyft common shares reversing and trading at $12.92 a share between 4:50 and 4:51 p.m.

25.     Between 4:05 p.m. and 4:51 p.m., however, over 31 million shares of Lyft common stock traded at inflated prices.

26.     And it was not until 6:02 p.m. on February 13, 2024 that Defendants issued a corrected Press Release, and it was not until February 14, 2024 that Defendants issued a corrected Form 8-K.

---

[4] The strong inference to be drawn from these facts that Defendants knew of the Misstatement either when the Press Release and Supplemental Data were issued, or within minutes thereafter, is supported by the accompanying Expert Report of Professor Patrick Gregory, CFA ("Gregory Report") (incorporated herein), a true and correct copy of which is attached hereto as Exhibit A.

27.     Subsequently, in interviews on February 14, 2024, Defendant Risher distorted the facts and misrepresented that the Misstatement was only in one document (the Press Release), when in fact the Misstatement was made twice (in the Press Release and Supplemental Data). Risher also misrepresented that Lyft had "issued an immediate correction…. We issued a correction in a second."  In fact, the correct figure was only provided 17 minutes into the call when Brewer referenced a 50 basis points margin expansion.  Defendants only explicitly acknowledged the Misstatement 24 minutes into the call, and then only in response to a question from an analyst.

28.     That Defendant Risher knowingly or with deliberate recklessness misspoke the truth that the Misstatement was only in one document and that Lyft moved promptly to correct the Misstatement, contributes to the strong inference that the initial Misstatement and the failure to promptly correct the Misstatement was either knowing or deliberately reckless.  *See* ¶¶ 158-173, *infra*.

29.     Defendants' intentional or reckless misconduct allowed the Misstatement to be published and remain outstanding, misleading investors and artificially inflating the stock price significantly before the Misstatement was corrected.

30.     Defendants, in Lyft's Quarterly Report on Form 10-Q for the first quarter of 2024 ("Q1 2024 Form 10-Q"), filed with the SEC on May 9, 2024, conceded that the Company had a material weakness in its internal controls and attributed the Misstatement to such material weakness, and that the SEC had requested information and Lyft was cooperating with the SEC with respect to the Misstatement.

31.     However, to date, Defendants have refused to clarify the circumstances of the Misstatement and (although requested to do so) to provide to Plaintiff the same documents provided to the SEC.

### JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action is a civil action arising under the laws of the United States, and under Section 27 of the Exchange Act (15 U.S.C. § 78aa), which vests exclusive jurisdiction

1  for violations of the Exchange Act in the District Courts of the United States. The claims asserted

2  herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a))

3  and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

4       33.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and

5  Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Many of the acts and omissions charged

6  herein, including the dissemination of materially false and misleading information to the investing

7  public, and the omission of material information, occurred in substantial part in this Judicial

8  District.

9       34.     In connection with the acts, transactions, and conduct alleged herein, Defendants,

10  directly and indirectly, used the means and instrumentalities of interstate commerce, including

11  the U.S. Mail, interstate telephone communications, and the facilities of a national securities

12  exchange.

13  **PARTIES**

14       35.     Plaintiff Yuan Chen purchased 20,000 shares of Lyft common stock during the

15  Class Period and suffered damages as a result of the federal securities law violations and false or

16  misleading statements and material omissions alleged herein.  *See* ECF No. 1-1.

17       36.     Defendant Lyft is incorporated in Delaware and has its principal executive offices

18  in San Francisco, California.  Lyft common shares trade on the NASDAQ under the ticker symbol

19  "LYFT."

20       37.     Defendant David Risher has been the CEO of Lyft from April 2023 through to the

21  present, and has been a Director on Lyft's Board of Directors from July 2021 through to the

22  present.

23       38.     Previously, Risher had served as Senior Vice President of U.S. Retail at

24  Amazon.com, Inc. and as a General Manager at Microsoft Corp.  Risher holds an M.B.A. from

25  Harvard Business School.

26       39.     Defendant Erin Brewer has been the CFO of Lyft from July 2023 through to the

27  present.

28

40.     Brewer has a robust background in finance and strategy, having held leadership roles at Charles Schwab & Co., Inc. (a financial services company), Atlassian Corp. (a multinational software development company), and McKesson Corp. (a publicly-traded pharmaceutical company).

41.     Brewer holds a B.S. in accounting from Purdue University and an M.B.A. from the Haas School of Business at the University of California, Berkeley.

42.     Both Risher and Brewer are sophisticated professionals, with extensive experience at public companies.

43.     Defendants Risher and Brewer (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, Supplemental Data, and presentations to securities analysts, money and portfolio managers, and institutional investors.

44.     The Individual Defendants were provided with copies of the Company's Press Release and Supplemental Data alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

45.     Because of their positions and access to material non-public information, the Individual Defendants knew of or recklessly disregarded that the true facts relating to the 50 basis point Adjusted EBITDA margin expansion had been misrepresented, that the true facts were being concealed from the public, and that the positive representations that were being made were then materially false or misleading.

46.     The Individual Defendants are liable for the false statements pleaded herein.

47.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

//

//

//

**FACTUAL ALLEGATIONS**

**I.      LYFT TOUTED ADJUSTED EBITDA MARGIN AS A KEY OPERATING METRIC**

48.     Defendants introduced Adjusted EBITDA margin, calculated as   Adjusted EBITDA divided by Gross Bookings, on November 8, 2023, as a critical financial metric in Lyft's financial disclosures for the third quarter of fiscal year 2023.

49.     According to Lyft's Press Release dated November 8, 2023, "starting with the third quarter of 2023, we are presenting Gross Bookings, Active Riders, Rides, and Adjusted EBITDA margin (calculated as a percentage of Gross Bookings) as our key business metrics."

50.     Adjusted EBITDA margin is "calculated by dividing Adjusted EBITDA for a period by Gross Bookings for the same period."  *See* Supplemental Data – Q3 Fiscal 2023 Earnings   &   New   Metrics,   at   p.   4   (Nov.   8,   2023), https://s27.q4cdn.com/263799617/files/doc_financials/2023/q3/Lyft-Q3-2023-Earnings-Supplemental-Data-Final-2-1.pdf (last visited July 31, 2024) ("Nov. 8, 2023 Supplemental Data")

51.     In Lyft's Nov. 8, 2023 Supplemental Data, posted on its website dated November 8, 2023, Defendants added:

# Introducing Three New Total Company Metrics

**Aligns our reporting with our strategic priorities & how we are managing the business**

1. **Gross Bookings is a key indicator of the scale and impact of our overall platform.** It is defined as the total dollar value of transactions invoiced to rideshare riders including any applicable taxes, tolls and fees excluding tips to drivers. Gross Bookings also includes amounts invoiced for other offerings, including but not limited to: Express Drive vehicle rentals, bike and scooter rentals, and amounts recognized for subscriptions, bike and bike station hardware and software sales, media, sponsorships, partnerships, and licensing and data access agreements.[1]

2. **Adjusted EBITDA margin, measured as a percentage of Gross Bookings.** It is calculated by dividing Adjusted EBITDA for a period by Gross Bookings for the same period. Please note that our definition of Adjusted EBITDA is not changing with today's new metrics disclosures.

*          *          *

52.     Lyft's premise for analyzing and reporting Adjusted EBITDA and Adjusted EBITDA margin is that by excluding certain non-recurring and non-operating charges they "facilitate internal comparisons of our historical operating performance on a more consistent

basis." *See, e.g.,* Lyft Inc., Quarterly Report (Form 10-Q), at p. 53 (Nov. 9, 2023) ("Q3 2023 Form 10-Q").

53.     According to Lyft's public disclosures dated November 8, 2023, February 13, 2024 and May 7, 2024, Lyft believes "the adjustment to exclude the costs related to restructuring from Contribution and Adjusted EBITDA is useful to investors by enabling them to better assess [Lyft's] ongoing operating performance and provide for better comparability with [Lyft's] historically disclosed Contribution and Adjusted EBITDA amounts." *See, e.g.*, *id.* at p. 53.

54.     According to Lyft's Q3 2023 Form 10-Q (*id.* at 53), Adjusted EBITDA is a "key performance measure" and Adjusted EDITDA margin is "a key metric" that "our management uses to assess our operating performance and the operating leverage in our business."

55.     The calculation of Adjusted EBITDA, according to Lyft's 2023 Annual Report on Form 10-K ("2023 Form 10-K") (at p. 65), filed with the SEC on February 20, 2024, is based on net loss (calculated in accordance with GAAP), adjusted for (i) interest expense; (ii) other income (expense), net; (iii) provision for (benefit from) income taxes; (iv) depreciation and amortization; (v) stock-based compensation; (vi) payroll tax expense related to stock-based compensation; (vii) net amount from claims ceded under the Reinsurance Agreement; (viii) sublease income; (ix) transaction costs related to certain legacy auto insurance liabilities, if any; (x) costs related to acquisitions and divestitures, if any; and (xi) restructuring charges, if any.

56.     Lyft defines Gross Bookings as "the total dollar value of transactions invoiced to rideshare riders including any applicable taxes, tolls and fees, excluding tips to drivers.  Gross Bookings also includes amounts invoiced for other offerings, including but not limited to: Express Drive vehicle rentals, bike and scooter rentals, and amounts recognized for subscriptions, bike and bike station hardware and software sales, media, sponsorships, partnerships, and licensing and data access agreements."  2023 Form 10-K at p. 56.

57.     The February 13, 2024 Press Release highlighted the significance to Lyft's operations of non-GAAP disclosures, emphasizing again that "[a]djusted EBITDA margin (calculated as a percentage of Gross Bookings) is calculated by dividing Adjusted EBITDA for a period by Gross Bookings for the same period and is considered a key metric":

To supplement Lyft's financial information presented in accordance with generally accepted accounting principles in the United States of America, or GAAP, Lyft considers certain financial measures that are not prepared in accordance with GAAP, including Adjusted Net Income (Loss), Adjusted EBITDA, Adjusted EBITDA margin (calculated as a percentage of Gross Bookings) and free cash flow. Lyft defines Adjusted EBITDA as net loss adjusted for interest expense, other income (expense), net, provision for (benefit from) income taxes, depreciation and amortization, stock-based compensation expense, payroll tax expense related to stock-based compensation and sublease income, as well as, if applicable, restructuring charges, costs related to acquisitions and divestitures and costs from transactions related to certain legacy auto insurance liabilities. <u>Adjusted EBITDA margin (calculated as a percentage of Gross Bookings) is calculated by dividing Adjusted EBITDA for a period by Gross Bookings for the same period and is considered a key metric.</u>  Lyft defines Adjusted Net Income (Loss) as net loss adjusted for amortization of intangible assets, stock-based compensation expense (net of any benefit), and payroll tax expense related to stock-based compensation, as well as, if applicable, restructuring charges and transaction costs related to certain legacy auto insurance liabilities and cost related to acquisitions and divestitures….

<u>Lyft uses its non-GAAP financial measures in conjunction with GAAP measures as part of our overall assessment of our performance, including the preparation of our annual operating budget and quarterly forecasts, to evaluate the effectiveness of our business strategies, and to communicate with our board of directors concerning our financial performance.</u>  (Emphasis added.)

## II.   LYFT'S FOURTH QUARTER 2023 PRESS RELEASE MISREPRESENTED LYFT'S 2024 PROJECTED ADJUSTED EBITDA MARGIN EXPANSION

58.   Lyft released its year-end and fourth quarter 2023 operating results in the Press Release after the close of the market on February 13, 2024 at 4:05 p.m.  The Press Release was also filed on February 13, 2024 at 4:06 p.m. with the SEC as an exhibit to a Form 8-K.

59.   The Form 8-K informed investors that Lyft had "posted supplemental investor materials [Supplemental Data] on its … website."

60.   For the fourth quarter of 2023, Lyft reported Adjusted EBITDA of $66.6 million and Adjusted EBITDA margin of 1.8%.

61.   For the full-year 2023, Lyft reported Adjusted EBITDA of $222.4 million and Adjusted EBITDA margin of 1.6%.

62.   For the first quarter of 2024, the Press Release reported an "outlook" of Adjusted EBITDA of $50 million to $55 million and an Adjusted EBITDA margin of approximately 1.4% to 1.5%.

63.   Each of the Lyft Press Release (at p. 2) and Supplemental Data (at p. 10) misrepresented in a bulleted line item that Lyft anticipated FY 2024 "Adjusted EBITDA

[Earnings Before Interest Taxes Depreciation and Amortization] margin expansion (calculated as a percentage of Gross Bookings) of approximately 500 basis points year-over-year."

64.     Each of Defendant Risher and Defendant Brewer was quoted in the Press Release as CEO and CFO of the Company and had ultimate control over and was responsible for the contents of the Press Release and Supplemental Data.

65.     The 500 basis point Misstatement was clearly stated in the Press Release and Supplemental Data as its own line-item and the Misstatement would have been immediately apparent to the Individual Defendants.

### III.     ANALYSTS AND OTHER INVESTORS WOULD HAVE SOUGHT IMMEDIATE CLARIFICATION REGARDING THE MISTATEMENT

66.     *Bloomberg* lists 31 separate sell-side stock analysts who provided active coverage of Lyft common stock as of February 13, 2024.

67.     Sell-side analysts play an important role in gathering and disseminating information about publicly-held companies.

68.     As the U.S. Supreme Court has noted, sell-side analysts "'ferret out and analyze information' and this often is done by meeting with and questioning corporate officers and others who are insiders[, a]nd information that the analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities." *See Dirks v. SEC*, 463 U.S. 646, 658-59 (1983) (citation omitted).

69.     In addition to the sell-side analysts that followed Lyft common stock, according to *Bloomberg,* over 300 institutional investors had filed Schedule 13Ds or similar disclosure documents reflecting their ownership of Lyft common stock as of December 31, 2023.[5]

70.     Forty-five of those institutional investors owned one million shares or more of Lyft common stock.

71.     Included among those firms are such prominent investors as Fidelity, Vanguard, Blackrock, State Street, DE Shaw, Two Sigma Investments, and Natixis.

---

[5] Institutions file Schedule 13D on a quarterly basis.

72.     Although those "buy-side" institutional investors do not publicize their reports, most employ analysts who, similar to the sell-side analysts, follow Lyft common stock.

73.     Investors rely heavily on issuers for the adequacy of disclosures with respect to non-GAAP financial disclosures and projections.

74.     According to data obtained from *Bloomberg*, the consensus estimate[6] for the Adjusted EBITDA margin for 2023 was 1.51% as of February 12, 2023.  For 2024, the consensus estimate was 2.09% as of February 12, 2024.  These consensus estimates were recorded one day prior to the respective earnings results of the Company for each year and were projecting an Adjusted EBITDA margin expansion of 58 basis points (from 1.51% to 2.09%).

75.     For example, Wells Fargo equity analysts Ken Gawrelski and Alec Brondolo, in their February 6, 2024 Equity Research report, had projected $213.6 million of full-year 2023 Adjusted EBITDA and a full-year Adjusted EBITDA margin of 1.55% (based on projected gross bookings of $13,740 million).  For 2024, the Wells Fargo analysts were projecting a modest increase in Adjusted EBITDA margin to 1.76%, a margin expansion of 21 basis points, based on estimates of Adjusted EBITDA of $278.2 million and gross bookings of $15,768 million.

76.     Analysts at Truist, Youssef Squali and Robert Zeller, in a report dated January 26, 2024, were projecting $213 million of Adjusted EBITDA and gross bookings of $13,727.9 million for 2023 for an Adjusted EBITDA margin of 1.55%.  For 2024, Truist was projecting Adjusted EBITDA of $328.0 million and gross bookings of $15,393 million, for an Adjusted EBITDA margin of 2.1%.  Thus, Truist was projecting 55 basis points of Adjusted EBITDA margin expansion (from 1.55% to 2.1%).

77.     Jefferies analysts John Colantuoni and Brent Thill issued a Lyft equity research report dated November 9, 2023, shortly after Lyft issued its third quarter 2023 operating results. According to the Lyft equity research, the Jefferies analysts were projecting Adjusted EBITDA for 2023 of 216 million for an Adjusted EBITDA margin of 1.6%.  For 2024, those analysts were projecting $337 million of Adjusted EBITDA for an Adjusted EBITDA ratio of 2.1%.  Thus,

---

[6] A consensus estimate is a forecast of a public company's projected earnings based on the combined estimates of all equity analysts that cover the company.

Jefferies was projecting a 50 basis point improvement in the Adjusted EBITDA margin. The Jefferies analysts based their Lyft price target of $11 a share in substantial part on their estimate of Adjusted EBITDA.

78.     UBS analysts, Lloyd Walmsley and Stephen Ju, in a report also dated November 9, 2023, were particularly cautious and although they estimated the Adjusted EBITDA margin for 2023 at 1.5%, they only projected an increase in the ratio to 1.7% in 2024 (based on projected 2024 Adjusted EBITDA of $269 million)—a modest 20 basis point increase.

79.     Goldman Sachs analysts, in an equity research report dated January 11, 2024, were projecting Adjusted EBITDA of $216 million and Gross Bookings of $13,701 million for 2023 for an Adjusted EBITDA margin of 1.58%. For 2024, Goldman Sachs was projecting Adjusted EBITDA of $323 million and gross bookings of $15,563 million for an Adjusted EBITDA margin of 2.08%. Thus, Goldman Sachs was projecting 50 basis points of Adjusted EBITDA margin expansion (from 1.58% to 2.08%).

80.     Needham's report from November 9, 2023 was projecting Adjusted EBITDA of $211.1 million and gross bookings of $13,715.4 million for 2023 for an Adjusted EBITDA margin of 1.54%. For 2024, Needham was projecting Adjusted EBITDA of $242.2 million and gross bookings of $15,530.1 million for an Adjusted EBITDA margin of 1.56%. Thus, Needham was projecting 2 basis points of Adjusted EBITDA margin expansion (from 1.54% to 1.56%).

81.     Deutsche Bank's analysts, in a report dated November 9, 2023, were projecting Adjusted EBITDA of $211 million and gross bookings of $13,740 million for 2023 for an Adjusted EBITDA margin of 1.54%. For 2024, Deutsche Bank was projecting Adjusted EBITDA of $321 million and gross bookings of $16,108 million for an Adjusted EBITDA margin of 1.99%. Thus, Deutsche Bank was projecting 45 basis points of Adjusted EBITDA margin expansion (from 1.54% to 1.99%). Deutsche Bank analysts further reported that "we continue to expect only modest margin expansion in FY24."

82.     These sell-side analysts valued Lyft common stock using a multiple of Adjusted EBITDA.

83.     In time-sensitive stock trading situations, analysts almost certainly would have recognized that a 500 basis point increase in Adjusted EBITDA margin is an unprecedented large jump for a company in Lyft's position within the ride-sharing industry (especially from a first quarter "outlook" of Adjusted EBITDA margin of 1.4%-1.5%).

84.     For the first quarter of 2023, according to the Company's May 7, 2024 press release, Lyft achieved an Adjusted EBITDA margin of 0.7%.  Thus, for the first quarter of 2024, Lyft was only projecting a 70 to 80 point margin expansion.

85.     Assuming each quarter is weighted equally, to achieve a 6.6% FY 2024 Adjusted EBITDA margin, assuming a first quarter Adjusted EBITDA margin of 1.45% (as projected by Lyft), Lyft would have needed to achieve an even more unprecedented 8.3% Adjusted EBITDA margin over the later three quarters of FY 2024.

86.     Analysts' expertise in the industry and familiarity with Lyft's financial history would have prompted them to seek immediate clarification from Lyft.

87.     As the legal presumption of fraud on the market explains, in an efficient market, news is immediately assimilated by the market as a whole and is reflected in the stock price.  This is true of both materially true, and false and misleading information both during the trading day and in the after-market.  Thus, there is an urgent need to correct any statement made that was false at the time made.

88.     This urgency is driven by the potential material impact such a large difference could have on financial projections, valuation models, and investment recommendations.

89.     The time pressure to provide accurate guidance to clients or make informed trading decisions—with hundreds of thousands of shares traded per minute immediately after issuance of the Press Release—would have compelled analysts to quickly contact Lyft management to determine whether the reported figure was indeed an error and, if so, what the correct projection should be.

90.     Sell-side analysts are responsible for rapidly interpreting and reporting their analyses of company operating results within minutes of their issuance and do not have the luxury of waiting until a conference call to seek clarification of conflicting information.

91.     Analysts have a professional obligation to verify material information promptly to maintain the accuracy and credibility of their financial models, recommendations, and market guidance.

92.     The Financial Industry Regulatory Authority ("FINRA") Rule 2241(c)(1) requires that sell-side analysts must establish, maintain and enforce written policies and procedures reasonably designed to ensure that:

> (A) purported facts in its research reports are based on reliable information; and
>
> (B) any recommendation, rating or price target has a reasonable basis and is accompanied by a clear explanation of any valuation method used and a fair presentation of the risks that may impede achievement of the recommendation, rating or price target.

93.     Sell-side analysts would not have waited 25 minutes for the start of the conference call to issue their initial reports on Lyft's fourth-quarter results.

94.     Nor would they have issued reports assuming the 500 basis point margin expansion was accurate.

95.     Rather, when analysts encountered the reported 500 basis point expansion in Lyft's Adjusted EBITDA margin, they were compelled to immediately seek clarification from Lyft.

96.     Plaintiff, in preparation of this Amended Complaint, hired an investigative firm that called more than 30 of the stock analysts who followed Lyft common stock, seeking information on the analysts' personal knowledge concerning the Misstatement, including any communications with Lyft management.

97.     Those analysts however either did not answer the investigator's calls or declined to discuss with the investigator the events at issue.

98.     Nor has Plaintiff been able to, without the benefit of subpoena power, to obtain the sell-side analysts' initial commentaries (prior to the 4:30 p.m. conference call) to investors.

99.     However, given Lyft's status as an actively traded stock with a significant short position, and option contracts expiring on February 16, 2024, it is almost certain—with a high

degree of confidence—analysts would have immediately sought clarification from the Company within minutes of the Press Release's issuance and not have waited for the conference call.

100.     By virtue of those communications, it is almost certain that Defendants learned of the Misstatement shortly after the issuance of the Press Release.

101.     When faced with knowledge of the misstated Adjusted EBITDA margin, especially given the high trading volume in the stock, Defendants had a duty to correct the Misstatement promptly.

102.     The failure to promptly correct the Misstatement, particularly given the almost certain likelihood of immediate analyst inquiries, demonstrates knowing or deliberately reckless misconduct.

103.     The delay in addressing this material Misstatement 22 minutes after its issuance, 17 minutes into the analyst call, further supports the argument that Lyft either knowingly allowed the false information to persist or exhibited a degree of deliberate recklessness.

104.     Inasmuch as Lyft had reported an Adjusted EBITDA margin in 2023 of 1.6%, a 500 basis point "expansion" would have indicated a 6.6 percentage points Adjusted EBITDA margin, or a four and one-eight times increase in Adjusted EBITDA (6.6%/1.6%).

105.     Analysts that projected, for example, a 2.0% Adjusted EBITDA margin, a 500 basis point margin expansion from 1.6% would have yielded a three and three-tenths increase in Adjusted EBITDA margin (assuming Gross Bookings remained unchanged) and a corresponding three and three-tenths increase in estimated stock price ($6.6%/2.0%).

106.     The buy-side analysts and investors would have been similarly surprised by Lyft's Press Release and Supplemental Data, and (as Defendant Risher has acknowledged) would have probed the Company about the significant increase over prior expectations.

107.     Thus, there is a strong inference that one or more of those analysts—or other investors—contacted the Defendants or other Lyft personnel in the minutes immediately after the issue of the Press Release and Supplemental Data to obtain clarification on the 500 basis point margin expansion.

108.    Thus, Defendants knew or were almost certain to know of the Misstatement on or shortly after 4:05 p.m. on February 13, 2024.

**IV.    NEWS SERVICES REPUBLISHED THE MISSTATEMENT**

109.    News services and stock analysts also reported promptly on the more than four-fold anticipated increase in profitability from 1.6% to 6.6%.

110.    The Fly, an investor news service, reported (republished at 4:08 p.m. by *Bloomberg*) that Lyft "[s]ees FY24 Adjusted EBITDA margin expansion roughly 500 basis points."

111.    Streetinsider.com, another investor publication, also reported (republished by *Bloomberg* at 4:09 p.m.) that Lyft anticipated "[a]djusted EBITDA margin expansion ... of approximately 500 basis points year-over-year."

112.    Public companies actively monitor news sources after issuing quarterly news reports.  This practice is a crucial part of their investor relations strategy.

113.    Investor relations use media monitoring tools to track commentary by employees, analysts, investors, and activists.  This helps them manage the company's reputation, respond to misinformation, and gauge market sentiment.

114.    Defendants would have also learned of the Misstatement through their monitoring of those news services.

115.    To Company insiders who were familiar with Lyft's historical and anticipated operating results, the Misstatement in the Press Release and Supplemental Data would have stuck out "like a sore thumb."

116.    Risher acknowledged in a February 14, 2024 interview with CNBC that the initial Press Release was materially false and misleading, and that Lyft was alerted to the Misstatement shortly after the issuance of the Press Release and Supplemental Data: "Someone on the team noticed pretty fast that we were getting a lot of interest in the margin and she looked at the number and you could just see her jaw drop."

117.     Defendant Risher's CNBC interview referenced the time period leading up to the 4:30 p.m. conference call: "As you're doing these earnings calls, you got things coming in at you from a thousand different directions."

118.     It is illogical that analysts and investors would only reach out to the Company for clarification at 4:30 p.m. and not immediately after the issuance of the Press Release.

119.     In any event, Defendants waited until 4:47 p.m. to reference a "50 basis point expansion" and then again until 4:54 to acknowledge (in response to a question) the Misstatement.

120.     Throughout the period immediately after the issuance of the Press Release, given the rapid increase in Lyft's stock price and the media's reporting of the 500 basis point Adjusted EBITDA margin expansion, and the communications Defendant Risher conceded were coming in "from a thousand different directions," Company management, including Defendants Risher and Brewer, either had actual knowledge of the Misstatement or were deliberately reckless and indifferent to the truth of the misleading Press Release and Supplemental Data.

121.     The strong inference to be drawn from those facts is further supported by the accompanying Expert Report of Professor Patrick Gregory, CFA, who opines (at ¶¶ 36 and 40) that "it is highly likely" that stock analysts and investors would have reached out to Lyft management "promptly" to request clarification of the 500 basis point projection.

## V.     THE MISSTATEMENT CAUSED LYFT COMMON STOCK TO TRADE AT INFLATED PRICES WITH SIGNIFICANTLY INCREASED VOLUME

122.     Quarterly Press Releases can provide new information to investors that can rapidly move the price of a stock.

123.     As would be expected, the Misstatement set off a furious aftermarket rally in Lyft common stock, with the common stock price increasing minute by minute, with high volume.

124.     Lyft common shares had closed on February 13, 2024 at 4:00 p.m. at $12.13 per share.

125.    Between 4:08 p.m. and 4:41 p.m., Lyft's stock price climbed dramatically, reaching a peak increase of $20.25 per share, or approximately 67% or $8.12 per share from its closing price of $12.13 on February 13, 2024.

126.    By 4:30 p.m., Lyft's shares had risen to $17.95 per share.

127.    For example, based on the stock trading data obtained from *Bloomberg*, below is the Lyft's stock *price* movement between 16:00 and 16:51 p.m. minute-by-minute on February 13, 2024:



128.    Below is the Lyft's stock trading *volume* minute-by-minute between 16:00 and 16:51 p.m. on February 13, 2024:



129.    During the interval between the release of the Misstatement at 4:05 p.m. and the commencement of the earnings call at 4:30 p.m. on February 13, 2024, there was a substantial increase in the trading volume of Lyft common stock compared to the same time frame in the prior quarterly results release on November 8, 2023.

130.    Specifically, according to the data obtained from *Bloomberg*, the trading volume of Lyft common stock during that 25-minute period reached 10,871,268 shares on February 13, 2024.  This represents an 8.28 times increase compared to the trading volume of 1,312,887 shares during the same time frame on November 8, 2023, when the third quarter Adjusted EBITDA margin was released.

**VI.    THE 4:30 P.M. CONFERENCE CALL**

131.    Defendants' deliberate recklessness or knowledge of the Misstatement is further evidenced by the investor conference call, which was scheduled for 4:30 p.m.

132.    Lyft's operating results were anxiously awaited by investors, especially given the large short position in Lyft common stock.

133.     A conference call to discuss the Press Release was scheduled to be broadcast live on February 13, 2024 at 4:30 p.m. through Lyft's website.

134.    According to the transcript of the February 13, 2024 conference call, nine stock analysts were identified as asking questions on the call.

135.    Each of Sonya Banerjee (Head of Investor Relations; for approximately one minute), then Risher (for approximately eight minutes) and then Brewer spoke on the call.

136.    It is implausible that at the time these senior Lyft executives were speaking that they were unaware of the Misstatement.

137.    Risher spoke for a full eight minutes providing positive directional commentary without correcting the Misstatement.

138.    Among the positive commentary Risher provided was:

So we're entering the new year with a lot of momentum.  We're competing and executing really well, and we're giving drivers and riders great reasons to choose Lyft every day.  Again, our thesis is the customer obsession drives profitable growth, and we're keeping our foot on the pedal to prove it this year.

\* \* \*

The work we're doing … will underpin our top-line growth and margin expansion in 2024 and set up the same strong financial performance beyond…..  [I]n 2024 we expect Lyft to generate positive free cash flow on a full-year basis for the first time in our company's history.  It's a huge milestone for us….  As I said at the beginning, this will be the year we prove customer obsession leads to profitable growth.

139.   It was not until approximately 17 minutes and 20 seconds into the call that Brewer first spoke about anticipated 2024 Adjusted EBITDA margins.

140.   Brewer did not however at that time explicitly correct the Misstatement in the Press Release.  Rather, she only stated on the call that:

> The combination of top-line growth, operational excellence, and continued cost discipline with the full-year impact of our more efficient cost structure is expected to drive approximately 50 basis points of expansion in our Adjusted EBITDA margin as a percentage of gross bookings to 2.1%.

141.   However, Brewer's reference to the 50 basis point expansion had a direct impact on the market, with Lyft shares declining from $19.40 a share at 4:47 p.m. to $12.92 shortly after 4:50 p.m.

142.   According to *Bloomberg* data, reported volume, which averaged in excess of 500,000 shares per minute in the aftermarket after release of earnings, spiked to 2.86 million shares traded in the one minute from 4:50 p.m. to 4:51 p.m.

143.   At approximately 24 minutes and 20 seconds into the call, Brewer, in response to the second question in the Questions and Answers section, unapologetically corrected the 500 basis point error in the Press Release and Supplemental Data:

> **Nikhil Devnani, Analyst**….  Could we just please clarify the EBITDA margin expansion? I think the slides say 500 basis points, but, Erin, you mentioned 50 basis points, so I think it is 50 basis points….
>
> **Erin Brewer, Chief Financial Officer**….   This is Erin, and this is actually a correction from the Press Release.  You're correct.  In my prepared remarks, I referenced 50 basis points of margin expansion.  So if you look at our full-year performance for 2023 at 1.6%, you can translate that into approximately 2.1% in terms of our directional commentary in 2024….

144.   Lyft, however, did not issue a corrected Press Release or Supplemental Data until February 13, 2024 at 6:02 p.m.

145.   Lyft did not file an amended Form 8-K with the corrected Press Release until the next day, February 14, 2024.

146.   Large trading volume and the surge in Lyft's stock price after the Misstatement appears to have also been driven in some part by algorithmic trading systems that automatically—without human intervention—react to new information in earnings releases.

147.    A February 13, 2024 article from GuerillaStockTrading.com states that "[t]he leading suspect behind the aggressive accumulation of Lyft shares was likely Blackrock's Aladdin, one of the most prominent algorithmic trading systems," suggesting that Aladdin and other quant funds rapidly bought Lyft shares based on the Misstatement before it was corrected.

148.    An article dated February 14, 2024 from The Associated Press also attributes the after-hours spike in Lyft's stock to "auto-trading algorithms—or 'bots'—into a buying frenzy" based on the 500 basis points margin expansion forecast in the initial earnings release.

149.    Algorithmic strategies can rapidly impound new information into stock prices. The accuracy and timeliness of corporate disclosures are crucial for maintaining market integrity, mitigating risks of extreme price movements, and ensuring regulatory compliance, especially in light of these algorithmic strategies.

150.    The February 14, 2024, *The Wall Street Journal* attributed the large trading volume on February 13, 2024 to short covering: "Positive earnings reports typically drive short sellers to buy shares to cover their bets."

## VII.    DEFICIENT INTERNAL CONTROL

151.    Defendants' deliberate recklessness or knowledge of the Misstatement is further evidenced by the significant deficiencies in the Company's internal controls prior to and at the time of the material Misstatement in its earnings release on February 13, 2024.

152.    Each quarter Individual Defendants Risher and Brewer certified to investors in SEC filings, and most recently, prior to the Class Period, on November 9, 2023, in Lyft's Q3 2023 Form 10-Q that:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have: (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

153.    These representations were materially false and misleading in that as revealed by Defendants in the Q1 2024 Form 10-Q, filed with the SEC on May 9, 2024, stating that Defendants had neither designed nor tested the effectiveness of certain of Lyft's internal controls and procedures, and that as a result thereof, there existed a "a deficiency related to the review of our forward-looking, non-GAAP directional commentary for fiscal year 2024" and that "due to the deficiency …, our disclosure controls and procedures were not effective at a reasonable assurance level."

154.    This after-the-fact disclosure, made in a formal SEC filing, demonstrates that Lyft's representations regarding the efficacy of its internal controls were materially false or misleading, and the control deficiencies existed prior to the February 13, 2024 Misstatement.[7]

155.    Moreover, the SEC has issued a request for information and is seeking Lyft's cooperation regarding the Misstatement.  On May 9, 2024, Lyft, Inc. disclosed in its Q1 2024 Form 10-Q the following information regarding the material Misstatement in its earnings release and subsequent SEC inquiry—while simultaneously suggesting that the Misstatement was an innocuous "Clerical Error":

> On February 13, 2024, the Company published a Press Release announcing our financial results for the fourth quarter and fiscal year 2023 that was furnished with our Current Report on Form 8-K filed that same day.  The Press Release contained a clerical error relating to the Company's forward-looking, non-GAAP directional commentary for fiscal year 2024 (the "Clerical Error").  The Clerical Error was promptly corrected on the Company's earnings call and in an updated Press Release, and the Company filed an amended 8-K.  The U.S. Securities and Exchange Commission ("SEC") has requested information relating to the Clerical Error. The Company is responding voluntarily to the request.

---

[7] In the previous year, Lyft's 2022 Form 10-K filed with the SEC on February 27, 2023 provided that "[Lyft] maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022."

156.   By email dated June 6, 2024, Plaintiff sought production from Defendants of Lyft's communications with the SEC, including the production of any documents or information provided to the SEC.

157.   To date, Defendants have refused to provide those materials.

**VIII.   CEO RISHER ADMITS THAT THE MISTATEMENT WAS MATERIALLY FALSE AND MISLEADING BUT MISREPRESENTS LYFT'S EFFORTS TO CORRECT IT**

158.   Lyft's CEO David Risher took personal responsibility for the Misstatement.  He stated in an interview with *Bloomberg*, "[f]irst of all, it's on me," "at the end of the day...my bad."

159.   Risher acknowledged that "[i]t's an unacceptable error, again ultimately it's on me.  I'm the CEO.  Buck stops with me."

160.   Risher added in an interview on CNBC, "It was a bad error," "It is just a terrible thing.  It is an extra zero that slipped into a Press Release."

161.   However, Risher misrepresented in his February 14, 2024 interview on CNBC, the speed at which Lyft corrected the Misstatement:

Thank goodness we caught it pretty fast and we issued an immediate correction….
We issued a correction in a second.

162.   Risher on the *Bloomberg* interview also misrepresented the speed at which Lyft corrected the Misstatement in the Press Release: "Like with any mistake, I think it's not so much about the mistake itself.  It's also about how you correct for it.  And we've corrected for it, obviously in the moment."

163.   Risher also misrepresented on CNBC that "the only place the problem was was one place."

164.   In fact, the "problem" was in both the Press Release and the Supplemental Data.

165.   That the Misstatement was in two places creates a strong inference that the "problem" was either intentional or resulting from deliberate recklessness, or that the personnel responsible for drafting and reviewing the financial disclosures were deliberately reckless and did not understand what a basis point meant.

166.     Investors on Seeking Alpha were not impressed by Risher's purported contrition and the lack of speed with which Lyft made the correction.

167.     One investor wrote: "Hohoho.  I doubt he means it given the short squeeze."

168.     A second investor wrote sarcastically: "I'm sure this has nothing to do with short positions being manipulated."

169.     A third commentator wrote "Some angry shorts in the room."

170.     According to news reports, Lyft has a history of antagonism with short sellers.  In 2019, shortly after its initial public offering, Lyft threatened Morgan Stanley with legal action for facilitating short sales of stock.  The news articles reported that "[s]ince it involves the seller betting on the price of a given share declining, [short sales] can have a negative impact on the price of the given shares ….  Whether short-selling alone accounts for all of the company's price volatility is not known, but Lyft seems to think it played a major role."  Duncan Riley, *Lyft Threatens to Sue Morgan Stanley Over Short-Selling Trades*, SiliconANGLE (Apr. 7, 2019), https://siliconangle.com/2019/04/07/lyft-threatens-sue-morgan-stanley-short-selling-trades/.

171.     Moreover, in its Q1 2024 Form 10-Q, filed with the SEC on May 9, 2024, Lyft repeated the Misstatement that the error was "promptly corrected on the Company's earnings call and in an updated Press Release, and the Company filed an amended 8-K." Lyft Inc., Quarterly Report (Form 10-Q), at p. 27 (May 9, 2024).

172.     In fact, the Press Release was not corrected until 6:02 p.m. and the amended Form 8-K was not filed with the SEC until February 14, 2024.

173.     Notwithstanding his acceptance of blame, and that he secured $18,375,000  in stock compensation, in part, attributable to his misconduct (*see infra* ¶¶183-185), Risher has to date not offered to compensate investors who traded during the Class Period for his (admitted) Misstatement and acceptance of responsibility.

## IX.     THE INDIVIDUAL DEFENDANTS WERE FINANCIALLY MOTIVATED TO PERPETUATE THE MISSTATEMENT

174.     Each of Risher and Brewer was financially motivated to perpetrate the Misstatement, and has the financial resources to compensate Plaintiff and other members of the

1  Class for their damages—especially Risher, who has taken personal responsibility for the
2  misleading Press Release.

3      175.    Risher commenced services as Lyft's CEO on April 17, 2023.  According to Lyft's
4  2023 Definitive Proxy Statement (Schedule 14A) ("Proxy Statement"), filed with the SEC on
5  May 1, 2023 (at p. 38), upon becoming CEO, Risher was paid a "signing bonus" $3,250,000.

6      176.    Risher was also contractually entitled to be paid an annual base salary of $725,000
7  for 2023 and an annual target bonus opportunity of 100% of his base salary based on achievement
8  of performance goals.

9      177.    Risher's annual cash bonus for 2023 was set at $1,000,000.

10      178.    Risher was also entitled to significant stock-based incentive compensation based
11  on achieving stock price performance benchmarks.

12      179.    Defendant Risher's equity-based compensation was heavily skewed to
13  performance based restricted stock units ("PSUs").

14      180.    As stated in Lyft's 2024 Proxy Statement, filed with the SEC on April 25, 2024,
15  (at p. 36), the "sole equity award granted to Mr. Risher under the CEO Employment Letter
16  consists of PSUs that are 100% performance-based.  The board of directors and the Compensation
17  Committee currently intend for these PSUs to be the only equity award that Mr. Risher receives
18  during his initial term of four years in his role as CEO,…"

19      181.    The 2024 Proxy Statement (at p. 36) published the table showing a summary of
20  each PSU tranche, including the number of PSUs eligible to vest per tranche and the appliable
21  stock price target.

| Tranche | Company Stock Target Price | Price Increase over Base Price | PSUs Eligible to Vest |
|---------|---------------------------|--------------------------------|------------------------|
| 1 | $15.00 | 50% | 1,225,000 |
| 2 | $20.00 | 100% | 1,225,000 |
| 3 | $25.00 | 150% | 1,470,000 |
| 4 | $30.00 | 200% | 1,470,000 |
| 5 | $40.00 | 300% | 1,715,000 |
| 6 | $50.00 | 400% | 1,715,000 |
| 7 | $60.00 | 500% | 1,102,500 |
| 8 | $70.00 | 600% | 1,102,500 |
| 9 | $80.00 | 700% | 1,225,000 |
| *Total* | | | *12,250,000* |

182.   The 2024 Proxy Statement (at p. 36) also set out the feature of the PSU awards, including that: "Sustained stock price requirement: to earn the shares tied to each tranche, our average stock price must remain at or above the applicable goal for 90 consecutive calendar days. This requires that the stock price growth is sustained for a meaningful period in order for the shares to be eligible to vest."

183.   The PSUs were very valuable to Risher.  If Lyft's common stock price were to exceed an average price of $15 a share over 90 days, Risher would earn 1,225,000 RSUs, which, based on a $15 stock price, would be valued at $18,375,000.

184.   Lyft's closing stock price first exceeded $15 a share on December 14, 2023.

185.   However, by February 13, 2024, Lyft's stock price closed at $12.13 per share, and the average price from December 14, 2023 through February 13, 2024 was $13.52 per share.

186.   Defendants were motivated to misrepresent the true facts, at least in part because Lyft had a large short position and at least one research analyst who was short the stock had issued negative commentary on Lyft common stock.  The presence of the large short position and negative analyst commentary had a negative impact on the Individual Defendants' ability to earn stock-based performance bonuses.  Defendants knew or should have known that many if not most of the investors that traded on February 13, 2024 in the aftermarket were short the common stock or common stock options and were incurring substantial losses by covering their short positions, and therefore were motivated not to move promptly to correct the Press Release.

187.   According to *The Wall Street Journal*, in a February 14, 2024 news article: "The stock has been more targeted by short sellers than its gig-economy counterparts, with short interest accounting for nearly 12% of Lyft's shares outstanding compared with less than 3% for rival Uber, according to data from FactSet."

188.   A short position occurs when an investor borrows shares from the owner of common stock and sells those shares into the market.

189.   In effect, those shares become owned by two different investors—the first investor who loaned the shares and the second investor who purchased those shares from the investor who borrowed the stock.

190.    The investor who borrowed the stock and sold those shares to a third party is said to be "short" the stock in that they "owe"—or have a contractual obligation to return—those shares to the initial investor.

191.    Short sellers generally invest against a stock's performance in anticipation that the stock will decline in value so that the short seller can buy and return the lent shares at prices lower than the short seller had sold the shares initially.

192.    Whereas investors who are "long" a stock rely on the integrity of the market, but believe that the shares will appreciate in value, investors who are "short" a stock also rely on the integrity of the market but believe the shares will decline in value.

193.    Short sales are generally considered to depress the market price of a stock because it adds to the available number of shares that trade.

194.    Short sellers also at times issue research reports asserting that shares of Lyft common stock are over-valued by the market.  *See, e.g.,* Paragon Intel, October 19, 2023 ("New CEO Risher Introduces New Metrics, But Insurance Still Eating Away at Margins").

195.    Short sales are generally borrowed on margin and are marked to market weekly.

196.    That means that if the underlying shares increase in market price over a week, the short seller is required to increase the margin that covers their short position.

197.    When there is insufficient margin to cover the short sale, a brokerage firm can force the short seller to supplement the equity in the margin account or sell positions in the account.

198.    This protects brokerage firms to ensure that there is adequate equity in the short seller's account to cover the short position.

199.    In addition to borrowing and selling shares, an investor can be short the stock by selling call options.

200.    By selling a call, an investor is obligated to deliver shares of the underlying stock at the exercise price.

201.    If the price of a stock exceeds the strike price of the call, the investor that sold the call is obligated to purchase the shares on the open market at the higher market price and deliver the shares at the lower strike price.

202.    Calls that are short the market work similarly to common shares and are marked to market weekly.

203.    In addition to having a very large short position in common shares, Lyft call option contracts are actively traded.

204.    According to publicly available information, as of the close of trading on February 13, 2024 (at $12.13 per share) there were outstanding approximately 410,000 Lyft call options with strike prices ranging from $10 a share to $14.50 a share.

205.    Certain of those options contracts were to expire on February 16, 2024.

206.    Each option contract is equivalent to 100 common shares.

207.    Accordingly, the 410,000 call option contracts outstanding represented potential "short" exposure to those investors who had sold the option contracts of 41 million shares.

208.    Option contracts are highly leveraged and in circumstances of rapid price movement can cause significant losses to an investor.

209.    Thus, for example, an investor who sold 1000 option contracts with a strike price of $13 a share, will have lost $300,000 at a $16 common stock price (1000 x 100 x ($16 - $13)).

210.    Unlike a long investment, where the investor's risk of loss is limited to their investment, the risk of loss on a short investment is unlimited.

211.    Option contracts do not trade after market.

212.    Accordingly, the only way an option investor can cover a sale of an option in the aftermarket is to buy the common stock long and deliver the stock upon expiration in satisfaction of the option contract.

213.    For example, Plaintiff Yuan Chen purchased 5,000 common shares at $15.44 per share at 4:17 p.m. and an additional 15,000 common shares at $16.70 per share at 4:27 p.m. to offset call option contracts he had sold short that expired on February 16, 2024 (ECF No. 1-1), and were at strike prices of $17 (150 contracts) and $16 (50 contracts).

214.   The pressure of their short investment would have compelled investors to "cover" their short position by purchasing Lyft shares on the open market—thus, increasing the upside pressure on Lyft's stock price.

215.   That trading volume was so high in the aftermarket is in part the result of short investors, including option traders, seeking to cover their short positions.

216.   Options markets are correlated with common stock markets and a large short position in options similarly causes downward pressure on stock prices.

217.   The Individual Defendants are sophisticated financial investors and are knowledgeable with respect to trading of outstanding Lyft securities, including options.

218.   The Individual Defendants' knowledge is attributable to Lyft itself.

219.   The Defendants' failure to correct the Misstatement promptly was either knowing or deliberately reckless given Defendants' knowledge, among other things, that short sellers and option traders were seeking to cover their exposure.

220.   Each of Risher and Brewer is entitled to substantial performance based executive compensation based on Lyft common stock achieving certain price-based benchmarks.

221.   The presence of the large short position in Lyft common stock and options would have been considered by Risher and Brewer to be an impediment to their ability to achieve those performance based benchmarks.

222.   Subsequent to February 13, 2024, Lyft's common stock rebounded and first traded above an average price of $15 a share over a 90 day period, in March 2024, earning Risher his first tranche of 1,225,000 Lyft PSUs.

223.   One news service, FX Street, correlated the February 14, 2024 with the Misstatement in the prior day's Press Release and short covering:  "[I]t is hard to argue that initial euphoria regarding the typo did not play some part in Wednesday's share price spike.  Of course, there was ample speculation that heavy shorting prior to the earnings release had led to a short squeeze, causing the shorts to repurchase stock in order to close out their positions."

224.   The rebound in Lyft's stock price post-February 13, 2024, however, was short-lived, with Lyft common stock closing on July 31, 2024 at $12.05 per share.

225.     By reducing the short position after market on February 13, 2024, the Defendants increased the prospects of obtaining the tranche of PSUs based on an average price of $15 a share over 90 days.

226.     Brewer was appointed Lyft's CFO effective July 10, 2023.

227.     According to the Form 8-K filed by Lyft with the SEC on May 16, 2023, Brewer was entitled to a signing bonus of $650,000 and is entitled to annual compensation of $650,000.

228.     In addition, Brewer was granted non-performance based restricted stock units ("RSUs") of 1,064,039 shares, to vest over a four year period.  *See* 2024 Proxy Statement at p. 34.

229.     Brewer is also entitled to PSUs of 909,091 shares to vest over four years based on four performance thresholds, based on 90-day trading averages of $12.50, $15.00, $17.50, and $20.00 per share.  *See* 2024 Proxy Statement at pp. 33-34.

230.     Brewer achieved two of those thresholds in the first quarter of 2024.  *Id.* at p. 33. Like Risher, Brewer was motivated to undercut the short positions in Lyft to achieve those thresholds.

## CLASS ACTION ALLEGATIONS

231.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons who purchased or otherwise acquired Lyft common shares on a U.S. open market during the class period February 13, 2024 from 4:05 p.m. to 4:51 p.m. both times inclusive (the "Class"). Excluded from the Class are Defendants in this action, the officers and directors of the Company during the Class Period (the Excluded D&Os), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

232.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.

233.    During the Class Period, Lyft common shares actively traded on the Electronic Communication Network ("ECN").   ECN refers to one or more electronic communications networks to which an order may be submitted for display and execution by a broker.   ECNs electronically match buyers and sellers to execute limit orders.   Extended-hours session orders may also be executed by a dealer at a price that is at or better than the ECN's best bid or offer.   Millions of Lyft common shares were traded publicly during the Class Period.

234.    ECN trading operates with a high level of efficiency, enabled by the automated matching of buy and sell orders.   Unlike traditional trading systems, ECN executes transactions swiftly by directly connecting traders with liquidity providers.   This eliminates the need for intermediaries, reducing delays in order execution.

235.    That Lyft stock moved so promptly and in such high volume upon dissemination of the fraud and the corrective disclosure demonstrates the efficiency of ECN with respect to Lyft.

236.    As of February 12, 2024, the Company had more than 391 million Class A shares outstanding.   Record owners and other members of the Class may be identified from records maintained by Lyft or its transfer agent and may be notified of the pendency of this action by mail or email, using a form of notice similar to that customarily used in securities class actions.

237.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

238.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests that conflict with those of the Class.

239.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)      whether Defendants knowingly or recklessly made an untrue statement of a material fact or failed to correct the Misstatement promptly in violation of SEC Rule 10b-5(b);

d)      whether Defendants employed any device, scheme, or artifice to defraud in violation of SEC Rule 10b-5(a);

e)      whether Defendants engaged in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person in violation of SEC Rule 10b-5(c);

f)      whether documents, Press Releases, and other statements disseminated to the investing public and the Company's shareholders by Defendants during the Class Period misrepresented or omitted material facts concerning Lyft's Adjusted EBITDA margins;

g)      whether the market price of Lyft's common shares during the Class Period was artificially inflated and/or maintained due to the material misrepresentations or omissions and/or failures to correct the material misrepresentations or omissions complained of herein; and

h)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

240.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

241.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

242.    As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated by Defendants during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

243.    There is a strong inference of scienter that the Misstatement was so apparent that Defendants either knew of the falsity when the Misstatement was made or became aware of the material Misstatement shortly after 4:05 p.m. on February 13, 2024, and deliberately failed to correct the information in a timely manner, demonstrating deliberate recklessness or knowledge of the Misstatement.

244.    Lyft's stock surged by an extraordinary 67% or $8.12 in after-hours trading shortly following the 4:05 p.m. release, from $12.13 when the market closed on February 13, 2024, to trade as high as $20.25 in the aftermarket (between 4:40 p.m. and 4:41 p.m.).  This unusual stock movement, coupled with significantly increased trading volume, and news commentary would have undoubtedly further alerted Defendants to a potential issue with the earnings release.

245.    Trading volume and stock price movement was extremely high on February 13, 2024, compared to trading around the prior quarter's earnings announcement.

246.    On November 8, 2023, Lyft shares traded in a narrow band between $9.94 and $11.11 a share (after closing at $10.72 a share), and a total of only 1.3 million shares traded between 4:05 p.m. and 4:30 p.m.

247.    Moreover, on February 14, 2024 Lyft's CEO, David Risher, acknowledged that "we were getting a lot of interest in the [Adjusted EBITDA] margin" during an interview on CNBC's "Squawk Box."  There is a strong inference, stronger than any competing inference, that these communications occurred shortly after 4:05 p.m., indicating that Defendants became aware of the Misstatement almost immediately.  Despite this apparent awareness, the Company did not issue an immediate correction.

248.    The failure to promptly correct such a material Misstatement, especially given the dramatic market reaction, suggests a level of deliberate recklessness that reflects a degree of intentional or conscious misconduct.  The delay in correction from 4:05 until 4:47 or 4:54 (17 or 24 minutes into the subsequent analyst call), rather than issuing an immediate Press Release or Form 8-K, further supports this strong inference of fraudulent intent.

249.    Delays and mistakes in SEC financial reporting can have severe consequences, including SEC enforcement actions and significant stock price drops.  Defendants would have been aware of these potential consequences and the urgent need for immediate correction of such a material error.  The combination of the Misstatement's magnitude, the obviousness of the Misstatement to Defendants and other members of Lyft senior management (who knew that the Company was projecting a 50 basis point margin expansion), the immediate and significant market reaction, the positive media coverage (re-posting the 500 basis point margin expansion Misstatement), the acknowledged flurry of investor inquiries, and strong inference that sell-side and buy-side analysts contacted Lyft concerning the Misstatement, the delay in correction, the false statements as to where the Misstatement appeared (one rather than two places) and the speed at which the Misstatement was corrected, and the desire for Risher and Brewer to achieve the $15 average price benchmarks, strongly suggests that Defendants likely became aware of the error shortly after 4:05 p.m. but knowingly or with deliberate recklessness failed to take immediate action to correct it.

250.    Among other things, the Individual Defendants, and other of Lyft's officers and directors who were responsible for creating and overseeing Lyft's internal controls over financial reporting, failed to install simple control procedures to ensure that the February 13, 2024 Press Release and Supplemental Data were accurate.  It was not only reasonably foreseeable, but *certain* that the misleading Press Release would have immediate and consequential ripple effects on the market.

251.    By correcting the Misstatement the way they did, Defendants sought to deflect attention away from the materiality of the Misstatement and their own culpability with respect to the dissemination of the materially false and misleading Press Release and Supplemental Data.

252.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lyft, their control over Lyft's allegedly materially misleading statements and omissions, and their positions with the Company, which made them privy to confidential information concerning Lyft, participated in the fraudulent scheme alleged herein.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

253.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions, including the fact that Lyft management had actually projected a 50 basis point (rather than a 500 basis point) expansion of the Adjusted EBITDA margins.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

254.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, or shortly thereafter, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lyft who knew that the statement was false when made.

**LOSS CAUSATION**

255.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

256.    During the Class Period, as detailed herein, Defendants made untrue statements of material fact or failed to disclose information necessary to make the statements made by Defendants not misleading.  This artificially inflated the prices of Lyft common stock and operated as a fraud or deceit on the Class.

257.    When Defendants' prior material false statements and material omissions, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Lyft common shares fell precipitously, as the prior artificial inflation came out of the price.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

258.    The market for Lyft's common shares was open, well-developed, and efficient at all relevant times.

259.    As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Lyft common shares traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common shares relying upon the integrity of the market price of Lyft's common shares and market information relating to Lyft and have been damaged thereby.

260.    At all times relevant, the market for Lyft's common shares was an efficient market for the following reasons, among others:

a)    Lyft shares were listed and actively traded on the ECN, a highly efficient and automated market;

b)    As a regulated issuer, Lyft filed periodic public reports with the SEC and/or the NASDAQ;

c)    Lyft regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)    Lyft was followed by securities analysts employed by brokerage firms, including Bernstein, Goldman Sachs, Jeffries, and JP Morgan, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

261.    As a result of the foregoing, the market for Lyft common shares promptly digested current information regarding Lyft from all publicly available sources and reflected such information in the prices of the common shares.  Under these circumstances, all purchasers of

Lyft common shares during the Class Period suffered similar injury through purchasing Lyft common shares at artificially inflated prices.

262.    Therefore, Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

263.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' omissions of material facts necessary to make the statements made by Defendants not misleading, including but not limited to the facts that Defendants failed to correct the Press Release and Supplemental Data and Lyft's internal controls over financial reporting were ineffective and did not stop the Misstatement in the Press Release and Supplemental Data.

264.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the material Misstatement and omissions set forth above, that requirement is satisfied here.

## CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

265.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

266.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

267.    Based upon the facts alleged herein, during the Class Period, Defendants violated Section 10(b) and Rule 10b-5 in that they, in connection with the purchase of Lyft's common

shares by the Plaintiff and the Class, (a) used or employed manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC; (b) employed devices, schemes, and artifices to defraud; (c) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and/or (d) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the Plaintiff and the Class.

268.    Defendants engaged in a plan, scheme, and course of conduct, that was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate the market price of Lyft common shares; and (c) cause Plaintiff and other members of the Class to purchase Lyft commons shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

269.    There is a general duty to correct under the federal securities laws.

270.    Defendants either knew that the Press Release and Supplemental Data were materially misleading or were deliberately reckless as to the truth of the corporate disclosures, and failed to correct the disclosures within a reasonable time (or suspend trading).

271.    Pursuant to the above, plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the Press Release, and other statements and documents described above.  Such releases and statements contained untrue statements of material facts or failed to disclose material information necessary to make the statements made not misleading.

272.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lyft's business, operations, and prospects, as specified herein.

273.    Defendants, individually and in concert, directly and indirectly,  employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort

to assure investors of Lyft's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lyft and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common shares during the Class Period.

274.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lyft's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of Lyft's common shares.

275.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lyft's common shares was artificially inflated and/or maintained, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the Common shares trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Lyft's common shares during the Class Period at artificially inflated and/or maintained prices and were damaged thereby.

276.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.   Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the failure of Lyft's internal controls, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Lyft's common shares, or, if they had purchased such

common shares during the Class Period, they would not have done so at the artificially inflated and/or maintained prices that they paid.

277. By virtue of the foregoing, Lyft and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

278. Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

279. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common shares during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

280. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

281. The Individual Defendants acted as controlling persons of Lyft within the meaning of Section 20(a) of the Exchange Act as alleged herein.

282. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

283. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

284. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence

the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

285.     As set forth above, Lyft and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons of Lyft, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

286.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common shares during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A.     Declaring this action to be a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

C.     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' and experts' witness fees and other costs; and

D.     Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

///

///

///

Dated:  August 1, 2024

Respectfully submitted,

Nicole Lavallee (SBN 165755)
Jeffrey V. Rocha (SBN 304852)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
       jrocha@bermantabaacco.com

*Liaison Counsel for Plaintiff and the Putative Class*

**WOLF POPPER LLP**

By:    /s/ *Robert C. Finkel*
      Robert C. Finkel (Admitted *Pro Hac Vice*)

Philip M. Black (SBN 308619)
Robert C. Finkel (Admitted *Pro Hac Vice*)
Zilong ("Terrence") Zhang (Admitted *Pro Hac Vice*)
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com
      rfinkel@wolfpopper.com
      TZhang@wolfpopper.com

*Lead Counsel for Plaintiff and the Putative Class*