**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge

| | |
|---|---|
| YUAN CHEN, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| VS. | ) **NO. 3:24-CV-01330-TLT** ) |
| LYFT, INC., DAVID RISHER, and ERIN BREWER, | ) ) ) |
| Defendants. | ) ) ) |

San Francisco, California
Tuesday, January 14, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

> WOLF POPPER LLP
> 845 Third Avenue
> New York, New York 10022
> **BY:  ROBERT C. FINKEL, ATTORNEY AT LAW**

> BERMAN TABACCO
> 425 California Street, Suite 2300
> San Francisco, California 94104
> **BY:  ALEXANDER S. VAHDAT, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants:

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
BY:   **ELLIOT GREENFIELD, ATTORNEY AT LAW**


DEBEVOISE & PLIMPTON LLP
650 California Street, 31st Floor
San Francisco, California 94108
BY:   **JOSH A. COHEN, ATTORNEY AT LAW**


Also Present:        **Jillian Tancil**

**Tuesday - January 14, 2025**                              **3:16 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:**  Now calling Case Number 24-CV-01330, Chen vs. Lyft Incorporated, et al.

Counsel, when you're prepared, if you can come forward and state your appearances, beginning with the plaintiff.

**MR. FINKEL:**  Your Honor, Robert Finkel from Wolf Popper for the plaintiff.

**MR. VAHDAT:**  Good afternoon, Your Honor.  Alex Vahdat for the plaintiff.

**THE COURT:**  Good afternoon.

**MR. GREENFIELD:**  Good afternoon, Your Honor.  Elliot Greenfield, Debevoise & Plimpton, for defendants.  I'm joined by my colleagues Josh Cohen and Jillian Tancil.

**THE COURT:**  Good afternoon.  And will any of your colleagues be presenting this afternoon?

**MR. GREENFIELD:**  No.

**THE COURT:**  All right.  How about you, sir?

**MR. FINKEL:**  No.  Just me.

**THE COURT:**  All right.  Thank you.

All right.  Well, I have a few things that I'd like to bring to your attention.  Of course, my questions are ones of which you should give attention to.  I know that there is a schedule issue as well, and we'll deal with that at the very

end of the case after the Court hears your arguments.

I want to take a look at something.  46 minutes is what we're talking about, less than an hour, less than a day, and less than the six weeks that are referred to in the briefing.

The other issue is the movement of a decimal from $50 to 500 and whether this movement was something that was done intentionally in order to inflate, although temporarily, the appetite of investors or whether it was a mere mistake.  Was it something to cause intentional volatility or something that was immediately remedied and within a period of time that was acceptable?

And so if I'm missing the mark on some of this, let me know.  These are things in addition to my questions, because I'm trying to distill this as best I can to make sure that I'm focused on the most important parts of this case; and if I'm misled in my review of that, let me know, but also address my questions.

I said I wouldn't interrupt other parties.  I will do my very best not to interrupt you because you're the last to be called, but just make sure you please address each of the questions, starting with the defendant.

It's your motion.

            **MR. GREENFIELD:**  Thank you.

And thank you for providing the questions in advance.  It was very helpful.  I will do my best to address them.  I think

it will be helpful to try to do that in the context, in providing some context.

**THE COURT:**  And also, since you're the defendant, you also want to let me know whether you feel leave to amend would be futile or whether you have any issue with that.  So you may proceed.

**MR. GREENFIELD:**  Thank you.

So, fundamentally, this case is about a clerical error in a press release that was issued after the market was closed and it was quickly corrected.  It's not securities fraud.  It's not a close call.  It was an error and quickly corrected.  To suggest otherwise just doesn't make sense.  No company would purposefully issue a press release with a typo in it, only to have to rush to correct it.  Why would they do that?  There's only downside to that.  It doesn't make sense.

And it's not surprising that plaintiff is unable to allege any facts supporting a fraud claim here.  The only facts that plaintiff alleges, as opposed to guesswork and speculation and assertions, is that the press release that contained the clerical error was published at 4:05 p.m.  25 minutes later, at 4:30 p.m., the company held an earnings call that was broadcast live to the public; and during that call, Lyft's CFO corrected the error.  That was at 4:47.  So from initial publication at 4:05 to correction at 4:47, there's a grand total of 42 minutes.  I get 42 with my math.  I think you said 46.

Plaintiff alleges no facts showing that defendants were aware of the clerical error at the time the press release was issued, no facts indicating when defendants learned of the error, no facts indicating what steps the company took to investigate and correct the error, no facts showing that correcting the error in something less than 42 minutes was not reasonable, and no facts giving rise to a strong inference that defendants deliberately delayed correcting the error after becoming aware of it.

Plaintiff cannot turn this correction of an error into a securities fraud claim.  Notably, after the SEC requested information about the clerical error and conducted an investigation, it decided not to recommend an enforcement action against the company.

There are two aspects of plaintiff's claims, two separate theories, and I think it makes sense to address them one at a time.

There's, first, the question of whether plaintiff has pleaded fraud as to Lyft's publication of the press release; that is, whether defendants knew about the clerical error at the time.  And second is whether plaintiff has pleaded that Lyft didn't correct the error within a reasonable amount of time after becoming aware of it and, instead, deliberately delayed correcting it.

As we've set out in our briefs, plaintiff fails to state a

claim under either theory.  I'm not going to repeat everything in the briefs.  I'll just try to hit some of the highlights.

The plaintiff's claims regarding the publication of the press release fails for two separate and independent reasons. First, the clerical error was in a forward-looking statement, and the PSLRA's safe harbor provision completely exempts such statements from any liability.  The statement was identified as a forward-looking statement and it was accompanied by meaningful cautionary language, and that's the end of the analysis under the statute.

Your Honor's second question -- sorry to do it out of order -- was:  Why does that -- why does that cautionary language qualify as meaningful?

And if you look at Exhibit A to our motion, which is the press release, and you turn to page 4, you'll see the language that Your Honor quoted which identifies, quote [as read]:

". . . risks related to the macroeconomic environment and impact of the COVID-19 pandemic and risks regarding our ability to forecast our performance due to our limited operating history and the macroeconomic environment."

Those are certainly risks that would impact the statement at issue, which was a prediction of future adjusted EBITDA margin expansion calculated as a percentage of gross bookings. But the cautionary language doesn't stop there.  In the next

sentence, the press release continues on to say that [as read]:

"The forward-looking statements . . . are also subject to other risks and uncertainties, including those more fully described in Lyft's [SEC] filings . . . ."

And, in particular, its Form 10-Q for the third quarter of 2023 and its Form 10-K for the full year 2023.

And it's very common in these types of press releases to incorporate by reference risk disclosures from SEC filings, as Lyft did here, and the Ninth Circuit has expressly approved of that practice.

And I would refer the Court to *Police Retirement System of St. Louis vs. Intuitive Surgical Incorporated*, 759 F.3d 1051 at 1060.  That's the Ninth Circuit 2014.  And *In Re Cutera*, C-u-t-e-r-a, *Securities Litigation*, 610 F.3d 1103 at 1112, Ninth Circuit 2010.

And if you look at -- you might not have it in front of you, but if you look at Exhibit C to our motion, which is the Form 10-Q that's mentioned in the press release, page 1 of that document, which along the top would say "Page 4 of 110," contains a long list of risks related to forward-looking statements, many of which are directly relevant to the statement at issue.

And if you turn to pages 60 to 62 -- so that, on the top, would say "Pages 63 to 65 of 110" -- there are additional risk

factors listed, and those risk factors are then discussed in detail for the following 40 pages.

**THE COURT:** All right. And this is still Exhibit C?

**MR. GREENFIELD:** This is Exhibit C, yes.

**THE COURT:** Thank you.

**MR. GREENFIELD:** And I won't walk you through it, unless you'd like me to, but Exhibit D to our motion is the Form 10-K that is also referenced in the press release and, there, if you look at -- referring to the page numbers along the top from the caption -- pages 4 to 5 of 144 and then, again, starting on pages 14 and 15 of 144.

And those risk disclosures far exceed the requirements of the PSLRA safe harbor provision. The statute itself requires only that the language mention, quote [as read]:

". . . important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ."

And the cautionary language that I just referred you to more than satisfies that requirement. So the Court need go no further than that. You can't state a claim based on a protected forward-looking statement, period.

**THE COURT:** So you're saying it fails because of the requirements of the PSLRA?

**MR. GREENFIELD:** Exactly, yes. The statement at issue is a forward-looking statement. It's accompanied by meaningful

cautionary language.  According to the PSLRA safe harbor statute, it's just -- it's fully exempted from any potential liability.

THE COURT:  All right.  Can we go backwards for a moment?  And this is my earlier question about Professor Gregory's report.  Do you have any comments with regards to those questions?

MR. GREENFIELD:  Absolutely.  Do you mind if I answer that question in a minute?  I can go to it right now, if you like.

THE COURT:  All right.  I'm sorry if I'm taking you out of order.  Go ahead.

MR. GREENFIELD:  Well, I just wanted -- so there's -- that seems to be addressing the issue of scienter under their second theory of the duty to correct.

I just wanted to finish up on the first theory, which is whether there was -- whether they've pleaded fraud as to the initial publication.

THE COURT:  All right.

MR. GREENFIELD:  So the first part of that is "no" under the safe harbor provision.

The second part of that is, even if for some reason you found it didn't fall within that protection, they still haven't pleaded scienter as to that.  There's no facts anywhere suggesting that defendants were aware of the clerical error at

the time it was published.  They don't make any attempt, as far as I can tell, to plead any facts about that.

There's certainly -- you know, compared to some -- a typical securities case, there's no emails, there's no documents, there are no former employees or confidential witnesses, nothing suggesting, when the initial press release went out, that anyone knew there was the clerical error.

There is just a lot of "They must have known."  Right? "It was so obvious.  It was prominent.  They must have known." But the Ninth Circuit has consistently rejected trying to plead securities fraud based on kind of just unbased assertions of "They must have known."  You have to point to facts showing that they actually did know.

As to the correction -- well, I should mention one other point on this theory.  The other thing they point to is the core operations doctrine.  The core operations doctrine doesn't have any applicability here.  The core operations doctrine can be relevant to scienter in some cases where the question is whether senior executives knew some critical fact about the core operations of their company.  It does not apply to whether or not anyone knew about a typo in a press release.

And I think the *Snap* case that plaintiffs submitted as a notice of supplemental authority to the Court recently illustrates this distinction.  The question there was whether or not Snap's chief business officer was aware of a major issue

with advertisers that threatened more than half of Snap's revenue.  So that's a critical issue about a core issue -- a core operation of the company.  It's not at all on point to say that the core operations doctrine covers whether or not someone would have known about a typo.

Unless you have other questions on that, I will move on to the second theory, which is the duty to correct.

I think the law is clear on that, that the Ninth Circuit has not recognized a duty to correct.  A few other circuits have.  Some district courts within the Ninth Circuit have addressed claims on the assumption that such a duty exists.  Excuse me.  And, you know, courts such as the Seventh Circuit, that have expressly recognized a duty to correct, have instructed that after becoming aware of an error, companies are allowed a reasonable time to correct it.

Your Honor's third question, going fully out of order here -- sorry.

**THE COURT:**  Well, I will give you a hint.  Whenever an attorney doesn't answer any of the written questions, I take the position that they've conceded that issue in favor of the other party.

**MR. GREENFIELD:**  I promise I will address all three questions.

The third question was actually addressed to plaintiffs, but I'm even going to answer that one.

The Ninth Circuit in *Yahoo!* cited the Seventh Circuit's decision in *Higginbotham vs. Baxter International*.  And I think it's useful to quote from that case where the Seventh Circuit said [as read]:

"Taking the time necessary to get things right is both proper and lawful.

"Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention."

The *Yahoo!* case found a six-week period of time reasonable.  The *Higginbotham* case that it cites found two months reasonable.  And here, as we've mentioned, we're talking about something less than 42 minutes -- it's not 42 days, not 42 hours -- less than 42 minutes to correct an error.

I think, you know, even assuming, then, that a duty exists in this Circuit, a duty to correct, plaintiff fails to state a claim under that theory because he does not and cannot allege any facts demonstrating that communicating with analysts, investigating and verifying the error, and correcting it in less than 42 minutes is not reasonable.

I'm being instructed I have very little time left, so I'm going to jump ahead slightly.

The other reason that the duty to correct theory fails is that plaintiffs fail to plead a strong inference of scienter under that theory either.  They do not allege facts giving rise

to a strong inference that defendants deliberately delayed correcting the clerical error after becoming aware of it. There's, again, as a matter of common sense, no reason they would.  There's only negative financial and reputational outcomes to having a typo outstanding.

There's a lot of speculation as to what would have happened.  Maybe analysts would have made inquiries pretty soon.  Maybe defendants would have known of the error before they began the earnings call.  But that's pure speculation, and it's not entitled to any weight under the PSLRA.

And the same is true, to answer Your Honor's first question, about the speculation that's offered by plaintiff's expert.  In answer to your question, no, the Court should not consider the Gregory report in analyzing scienter because it doesn't satisfy either prong of the test from *Sgarlata*.

As to the first prong, Mr. Gregory has no personal knowledge or insight into what the defendants knew or when.  He doesn't even pretend to.  If you actually scroll through his report, there's 35 paragraphs of introduction; and then he speculates that maybe some analysts would have reached out to the company at some point prior to the 4:30 earnings call, but he doesn't know one way or the other, which brings us to the second prong of the *Sgarlata* test.

Mr. Gregory's speculation is not indicative of scienter. Whether analysts reached out to the company before or after the

earnings call began says nothing about defendants -- whether defendants deliberately delayed correcting the error.  He's got no insight whatsoever into the state of mind of any of these defendants.

I think it's not -- from my perspective, it doesn't pass the *Sgarlata* test; it should not be considered.  But if you did consider it, I don't think it makes any difference because it doesn't say anything about scienter.

And I'm going to just stop there and save whatever few minutes I have left.

**THE COURT:**  You have five minutes for response.

**MR. GREENFIELD:**  Thank you.

**THE COURT:**  And so, also, think about that other question about leave to amend.

Counsel for the plaintiff?

**MR. FINKEL:**  Apologize for all my materials, Judge.

**THE COURT:**  Take your time.

**MR. FINKEL:**  The case is a simple case.  Lyft is a car service company.  In 2023, they announced their two most important metrics:  their gross bookings, which is the amount of business they do, and adjusted EBITDA.  EBITDA is earnings before income, taxes, depreciation, and amortization.  It's generally considered comparable to cash flow, how much cash they bring in versus how much cash they spend.

Fast-forward to February 13th, 2024.  The company issues a

press release at 4:05 p.m.  The press release and the announcement of the press release is told by investors in advance, ten days in advance, "We're going to be earning" -- "releasing the financial statements."

There are 31 analysts that actively follow this stock. They're all listening acutely to find out what the company did in the fourth quarter of '23 which they report on February 13th because their clients want to know whether they should be buying or selling the stock.

Included in those investors are people who are short the stock.  People who are short the stock borrow the shares from a third party, and then they sell the stock into the market, knowing that they would have to borrow the shares back to return it to who they borrowed it from.

Short sellers generally want stocks to go down.  Long investors want stocks to go up.  That's why we have bulls and bears and why we have markets.  There's nothing wrong with people being short.

Lyft, because it's the weak sister, if I may say so, to Uber, tends to have a very large short position.  Everybody knows that.  And nobody really likes it when the stock is heavily shorted because it increases the float of shares in the market and creates pressure on the stock price.  That's just, like, economics.  There's no doubt to it, I mean, as far as pleading.  There's no -- companies do not like short positions

in their stock.

Anyway, the press release comes out; and rather than telling, factually, that the company expects 50-basis-point improvement in EBITDA gross margin, the press release reads 500 basis points.

That means that rather than achieving a 2 percent profit margin, the company is telling the market, at 4:05 p.m., that we anticipate a 6.6 percent profit margin, because historically the company only did 1.6 as a profit margin. So a 500-basis-point -- a basis point is equivalent to 1/100th of a point. So a 500-basis-point improvement is 5 percent. So, historically, if you're doing 1.6 percent, you're telling the market -- and you're talking about hundreds of people listening in -- that the stock price, the shares are going to generate 6.6 percent of cash flow.

Now, investors can't interpret that information because it's anomalous. For example, Uber, which is, one would say, a more successful company, does 3 percent profit margins. You don't go overnight from 1.6 to 6.6. But investors don't know what the right number is. So what do they do? They call the company. I mean, is that -- and that, essentially, is what Professor Gregory says.

There are 31 analysts. He reviewed each of their reports. The analysts are saying that: We expect the company to report anticipated 2 percent profit margins.

Professor Gregory is a market professional, so he knows how markets work.  He knows that when a company comes out with anomalous numbers that the market has difficulty interpreting, analysts call the company.  And that's all he says.  He says that:  I looked at the 31 research reports.  I saw what the analysts were projecting.  I infer from that, the way the markets work, that they called the company.

Now, there are -- I start on the expert report, but we know in *Nvidia* the exact same issue arose, where the plaintiff got an expert to go through market information and opine that Nvidia anticipated a large percentage of their profits from gaming.

So Nvidia got cert granted to the Supreme Court, but the Supreme Court said that cert was improvidently granted and returned the case to the Ninth Circuit.  So the controlling precedent is not *PayPal*.  The controlling precedent is *Nvidia* and *Oracle*.

And I have a lot of notes, but I just want to read this. This is what *Nvidia*, the Ninth Circuit says, 81 F.4th at 942, quote [as read]:

"To get" -- "To categorically hold that, to be credible, an expert opinion must rely on internal data and witness statements would place an onerous and undue . . . burden on plaintiffs . . . ."

Okay?  So we know that, in light of the stay of discovery

in securities cases and in light of the fact that the 31 analysts all publish reports, Professor Gregory did what he needed to do to come to the opinion that these analysts would have -- there was a high degree of likelihood that they would have contacted the company.

But that's not all we know because --

**THE COURT:**  Well, let me go back.

So are you saying that *Nvidia* has replaced the standard that was articulated in *PayPal* in terms of Professor Gregory's analysis?

**MR. FINKEL:**  Well, I think *Nvidia* -- I'd have to look at the dates, but I think *Nvidia* is the most recent statement on that subject matter by the Ninth Circuit.

But more important than *Nvidia* and expert reports is what the defendant Risher said, because he went on CNBC and Bloomberg TV the next day to be interviewed and this is what he said.  He said [as read]:

". . . you got things coming at you from a thousand different directions."

What's important about this is that the defendants don't write it -- don't mention this in their brief, what their own client said about when he learned of the misstatement in the press release.  He said [as read]:

". . . you got things coming at you from a thousand different directions."

And [as read]:

"Someone on the team noticed pretty fast that we were getting a lot of interest in the margin and she looked at the number and you could just see her jaw drop."

Now, I don't know when that happened.  He does.  And he doesn't say -- he has the documents, and he won't say when it happened.  But he doesn't even reference the quote.

So -- and it makes no sense that at 4:05 the press release comes out, at 4:30 they have a conference call, for 17 minutes they talk about nonsense -- you know, they talk about driverless cars; they talk about airports, that if you get to the airport late, you don't have to pay the fare -- for 17 minutes they let investors believe that there actually may have been a 500-basis-point improvement in cash flow.  And only in the 17th minute does the CFO say, in a discourse, that "We anticipate a 50-basis-point improvement in profit margin."  But she doesn't correct the press release.  She doesn't apologize.  She doesn't say, "We made a mistake."  She just says, "We expect a 50-basis-point correction."

And to prove that analysts are following the stock price that had gradually moved up to $20 a share, as soon as she says that, the stock drops like a rock.  It goes from 20 back to 12, where it started from.

And Bloomberg -- God bless Bloomberg -- it shows every

trade aftermarket. So you could see exactly when the CFO made the statement and you could see the next tick.

So quite different from accepting defendants' recitation that they didn't know and they corrected it quickly -- I think that's Mr. Greenfield's statement -- you're talking about 500,000 shares ticking every minute for 25 minutes before the call, for 17 minutes during the call while they're talking nonsense. And Mr. Greenfield says that's quickly.

And we know from the *Oaktree* case and a number of cases that got cited in our brief, whether it is or isn't quick is a jury question. So let Mr. Greenfield argue that to the jury. Say 25 minutes and 17 minutes, 42 minutes, while we're talking about if you get to the airport late, you don't have to pay your fare, we let this thing persist. And I don't know why they did.

But in *Tellabs*, Justice Ginsburg says scienter could be both subjective and objective. You don't have to prove or plead necessarily a financial motive to get a complaint sustained.

But here, we do have a financial motive. We know that there's a very large short position. We know short positions put a ceiling on stock prices. And we know that Risher has incentive compensation that if the stock trades above $15 a share on an average of 90 days, he gets $18 million. $18 million.

So does he remain quiet because he's hoping that nobody notices?  That might be true.  He's terribly embarrassed, I'm sure, because he made this mistake.  Now, I don't think he intend- --

**THE COURT:**  Well, let's go to the duty to correct and the time frame, because you said 4:05 and then you said that they spend these 17 minutes talking about nonsense.  And so from your perspective, at 4:06, that should have been the first thing they said to correct the error rather than waiting even 17 minutes in.

And so if you can just talk a little bit more about the duty to correct and when that time kicks in.

**MR. FINKEL:**  If I can, just as a predicate to that question, a duty to correct is sometimes interpreted two ways. A statement that is false when made needs to be corrected, assuming it's material; and here, it's clearly material.

There's also a duty to update.  A duty to update is a statement that is true when made that becomes false by change in facts.  And that really is the *Yahoo!* case.  That's one thing that we -- you know, I'll get to.

But the Ninth Circuit has not found a case where there was a historical statement that was materially false, but without knowledge, where the defendant or the speaker obtained knowledge and failed to correct.  You know, in each of the instances that the Ninth Circuit discusses -- and I think it's

called P-r-o-d-a-n-z-o or a-n-g-o.  I'm not sure.  I always -- I have a mental block on that case.

In the *Yahoo!* case, the Court came very close to saying that there's a duty to correct.  And in *Yahoo!*, the Court cited the Seventh Circuit case *Stransky* and said that *Stransky* seems to be well decided; *Higginbotham* in the Seventh Circuit; and there's a couple of cases in the First Circuit.  No cases found that there's no duty to correct a historical statement that's false when made.

There are some cases that talk about a duty to update, depending on materiality, because you have -- you have a reporting mechanism where you have a 10-Q and then, three months later, you have another 10-Q.  So in a 10-Q, you say what is the best information that you have, and investors know that you'll update it three months later.

If something happens that's material in that period of time, it's a matter of judgment.  Generally speaking, you don't have to update unless you trade.  You know, if you -- if insiders at the company want to trade, it's always a good idea, if it's a material update, you disclose it, or you can have -- as you said in the first oral argument, you'll have a 20A claim, an insider trading claim.  So you always want to update something that's material.

But here, you have a duty to correct because the statement was false when made.  And there's no suggestion -- we have five

or six cases in the brief.  There's no suggestion that on the right facts, that the Ninth Circuit won't find a duty to correct a statement that's historically false.

THE COURT:  And then the timeline.  Only because, speaking of time, you have five minutes, and I want to make sure we leave you some time for response.

So time frame on the duty to correct, what would you say? Under these facts, because everything's very fact intensive, under these facts, when should that have occurred?

MR. FINKEL:  Well, really, the answer is immediately or in a minute.

In the *Higginbotham* case -- and there are a lot of cases, and I might have this one wrong -- there was a problem in a subsidiary in Brazil.  It might not have been *Higginbotham*.  It might have been another Seventh Circuit case.  But in that case, it took some time to hire consultants and go down to Brazil and find the truth.  So the Seventh Circuit said that two months is immediate.

But the answer really is, the defendant himself, when he got on TV the next day, he said, "Listen, we made a bad mistake, it was my fault, but we corrected it in a minute."

So it's in the brief.  I think it's around para- -- it's in the complaint.  It's paragraph 2.

THE COURT:  So 60 seconds, he should have made that correction?

**MR. FINKEL:**  There's no doubt.  There's no investigation.  It's 50 basis points or 500 basis points. Like, how do you investigate that?  You don't have to go to Brazil to investigate that.

The first thing -- you know, at the very latest, at 4:30, the first thing out of his mouth should have been "I'm terribly sorry."  He shouldn't have waited until the next day.  "I'm terribly sorry, but we made a big mistake."

There's no justification for waiting those 17 minutes. And it's totally incredible to argue that he didn't know by 4:30, 25 minutes after the press release was issued, that he had made a terrible mistake.  He acknowledged it.  He took full responsibility, except in the court of law.

Now he says:  I made a mistake.  A lot of people lost money, but it's their problem.  I got my $18 million because the stock traded above 15, and my 18, I'm going to keep.

It's just -- I mean, there's an equitable argument here as well as a legal argument.  Why should Risher keep his money and the people who relied on him lost money?  I just want to make sure --

**THE COURT:**  All right.  I'm going to reserve three minutes for you --

**MR. FINKEL:**  Yeah.

**THE COURT:**  -- to be able to respond, and to allow the defendant to return to the podium, and then you still will have

three full minutes to respond.

**MR. FINKEL:**  Thank you.

**THE COURT:**  Thank you, Counsel.

**MR. GREENFIELD:**  Thank you, Your Honor.

He said a number of things that I'd like to respond to.

**THE COURT:**  Five minutes.

**MR. GREENFIELD:**  I'll try to do it quickly.

Five minutes.  I know that.

First of all, on Mr. Risher's statement, he's leaving out the opening part of it, which if you look at paragraph 116 and 117, it starts with [as read]:

"As you're doing these earnings calls, you got things coming at you from a thousand different views [sic]."

And someone noticed pretty quickly.

He's suggesting, if anything, if you can read anything into that statement, it's that during the earnings call, information was coming at him, and somebody noticed the error. So if you want to draw any inference from that statement, it would be that it wasn't identified until after the earnings call began and it was corrected by the CFO when she reached her reporting on that particular metric.

He didn't answer your question, I don't think, about when does the time to correct an error kick off because he can't say because he doesn't know when anyone learned of the error.

But the answer is that the time to correct starts when you become aware of it.  It doesn't start at 4:05.  And there's no factual allegation, there's no particularized facts in the complaint saying when anyone learned of it.

There's -- this is in the brief, so I won't spend too much time on it, but this speculation that Lyft was out to get short sellers is complete speculation that can't come anywhere close to meeting the standard for scienter under the PSLRA.

The comp argument, also addressed in the briefs and in one of our attachments which lays out the basis of the comp, it depends on closing above a certain price, the stock closing above a certain price for -- it's either 60 or 90 days.  It's not going to be impacted by delaying, you know, another few unspecified number of minutes in the after-hours -- right? -- which doesn't affect closing price.  So the motive doesn't apply there.

Experts can be taken into account, along with the complaint in some circumstances, where they're doing factual analysis; so if you have an expert who let's say is an accountant, is analyzing a company's reported financial statements, can make a factual presentation about those financial statements.  When an expert turns to try to say "I wasn't there, but this is when Mr. Risher knew of the error" or "This is when an analyst would have called investor relations," that is beyond the scope of an expert and doesn't impact the

scienter analysis.

It's not a jury question whether the time is reasonable, as we cite cases in our briefs.  Courts regularly decide this on the pleadings.

In this case, I think it's a very easy call because something between, you know, one and 42 minutes is -- I think just common sense tells you that that is prompt and within the range of reasonableness and being prudent.

And if you get in -- you know, if you're alerted to an error, you do have to do some amount of investigation.  You know, it's a public company.  You have to talk to the other people.  You have to get authority.  You have to decide the correction; you have to make it.  It does take some time.

**THE COURT:**  Well, counsel's implying that there was some kind of communication almost immediately that there was a mistake.

**MR. GREENFIELD:**  I know, but that's based on a misstating of Mr. Risher's statement.  So there's no -- that's not valid.

And to the extent he's relying on, you know, his speculation about when analysts would have, you know, contacted investor relations or investors would have called or asked questions, again, none of that is in the complaint.  There's no specific factual allegation as to when that happened.

Very quickly, leave to amend.  Given the 42 minutes that

we're talking about here, the less than 42 minutes, I don't think that there's anything they could possibly add, in terms of facts, that would take this out of the realm of a correction within a reasonable amount of time.

**THE COURT:**  Thank you.

**MR. GREENFIELD:**  I'll leave it there.  Thank you.

**MR. FINKEL:**  Yeah, a couple of points because I only have my three minutes.

The company, you know, again -- and I probably said this. The company never affirmatively apologized or said, "We made a mistake."  Again, they spoke for 17 minutes.  And then after Brewer, the CFO, said that the margin expansion was 50 basis points, they took a question; they answered the question.

The second question said, "You said in the press release 500 basis points."  And only then, 56 minutes into the call, did Brewer say, "Oh, that was a mistake."

So at some point, they did learn it was a mistake, and it was before the 54th minute, and they never said it.

And I'm entitled to a reasonable inference, based on these facts and Professor Gregory's report, that the company learned about it early on, because they didn't act in good faith.  So the inference would -- I mean, if they had said "Oh, my God, we just learned that we made a mistake," that would at least show some good faith; but all we have is their -- is their trying to dissemble the truth and never come forward with the true facts.

In terms of your question, we discussed Professor Gregory. On meaningful cautionary statements, it's important to note that the statement that "We expect a 500-basis-point expansion" is a current statement of expectation.  So even though defendants have said that it's a forward-looking statement, it's not discernible only on the basis of future events.  A forward-looking statement is not true or false until you get to the future.  But the statement is false -- this particular statement was false when uttered, and that's the definition of something that is not a forward-looking statement.

**THE COURT:**  Now, they're indicating that the PSLRA provides some protection on mistakes.

**MR. FINKEL:**  Only if it's a forward-looking statement.

**THE COURT:**  All right.

**MR. FINKEL:**  But it's not a forward-looking statement. And even if it has protection, the cautionary statements do not apply when the fact has already existed.

And that's another thing.  That's the *Facebook* or the *Meta* case where they say, "We're prone to, you know, people stealing our data or misusing our data."  But they already knew that the data was being misused.

So a cautionary statement has no weight under the PSLRA if you know that the event has already happened that you're telling people to be cautious about.

But I have one last thing.  In the supplemental data --

they made the mistake twice.  Now, I'm not saying that they intended to make the mistake, but it is an extreme departure from ordinary care.  It's a very -- this is one of the two most important metrics of the company.  It's on its own line item. Did they read it and not pay attention?  Like, what's extreme departure?  This, I submit, is an extreme departure even when the initial press release got issued.

But what I want to say is that in the supplemental data that also had the mistake, they said -- and this is a quote.  I have it.  It's in their record.

**THE COURT:**  This is the last comment.

**MR. FINKEL:**  Yes.  They say, "Based on our current levels of visibility around the business and the macroeconomic environment for full year 2024, we expect" -- and then they said -- "adjusted EBITDA margin expansion of approximately 500 basis points."

When they said --

**THE COURT:**  Thank you.

**MR. FINKEL:**  -- "based on our current levels of visibility" --

**THE COURT:**  Counsel?

**MR. FINKEL:**  -- that takes it out of a forward-looking statement.

**THE COURT:**  Thank you.

**MR. FINKEL:**  Thank you.

**THE COURT:** All right. Thank you. And thank you for the courtesies.

At this time, we do need to adjourn. The Court will take into consideration all arguments. An order will issue within seven to 14 days of today.

We have serviced your request at ECF 56. There is a new schedule uploaded with some modifications to address the requests that you have made.

Depending upon the Court's ruling, if the Court rules in favor of one party or the other, either the dates will be vacated or we will maintain the dates and I will see all of you again on April 25th at 2:00 p.m. on case management.

Thank you.

**MR. FINKEL:** Thank you.

**MR. GREENFIELD:** Thank you very much.

**THE COURT:** Thank you.

**THE COURTROOM DEPUTY:** Thank you. Court is adjourned.

(Proceedings adjourned at 4:02 p.m.)

---o0o---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, January 30, 2025

_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter